[No. B005918. Second Dist., Div. Seven. May 30, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
HARRY M. SASSOUNIAN, Defendant and Appellant.

**COUNSEL**

Cleary & Sevilla and Charles M. Sevilla for Defendant and Appellant.

John K. Van de Kamp, Attorney General, William R. Weisman and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**CROSKEY, J.**\*—The defendant and appellant Harry M. Sassounian (herein the defendant), appeals from the judgment imposing upon him a sentence of life imprisonment without possibility of parole following a jury trial in which he was found guilty of murder in the first degree (Pen. Code, § 187), with a true finding of the special circumstance that the killing was because of the victim's nationality or country of origin. (Pen. Code, § 190.2, subd. (a)(16).)[1]

### FACTUAL BACKGROUND

On the last morning of his life, Kemal Arikan (herein Arikan), the Consul General of the Republic of Turkey at Los Angeles, left his home in the Westwood area of Los Angeles to go to work, unaware that two armed men waited two blocks away to kill him for no other reason than he was who he was (i.e., a Turk, and an official representative of the government of Turkey). It was 9:40 a.m., January 28, 1982. He drove his usual route, east on Ashton Avenue to Comstock Street and north on Comstock with the intention of turning right on Wilshire Boulevard. He never made it.

---

\*Assigned by the Chairperson of the Judicial Council.

[1]The defendant was also charged with the special circumstance of lying-in-wait (Pen. Code, § 190.2, subd. (a)(15)) and that he used a firearm during the commission of the offense (Pen. Code, §§ 12022.5, and 1203.06, subd. (a)(1)). However, at the time the jury returned its guilty verdict on January 4, 1984, it advised the court that it was unable to reach a verdict on either of these charges and a mistrial with respect to those charges was declared. Subsequently, on June 15, 1984, the date of sentencing, these charges were dismissed at the request of the People. (Pen. Code, § 1385.)

The evidence, viewed in the light most favorable to the judgment (*People v. Brock* (1985) 38 Cal.3d 180, 198 [211 Cal.Rptr. 122, 695 P.2d 209]; *People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]), established that about 9:45 a.m. on January 28, 1982, as Arikan stopped at the signal light at Comstock and Wilshire, two men, each armed with a large caliber handgun, approached the vehicle (which was equipped with California "Consular Corps" license plates), one from the driver's side and the other from the passenger's side, and fired a number of rounds at Arikan from very close range. Arikan died within a very few minutes from multiple gunshot wounds to the head and chest. Following the shooting the two gunmen ran south on Comstock, deposited their weapons under a hedge and then made their escape in a grey car. Unfortunately for the defendant, these events were witnessed by a number of people.

At least three eyewitnesses made a positive identification of the defendant as one of the two men who had been seen (1) waiting on the corner a few minutes before the shooting took place,[2] (2) standing by the passenger side of Arikan's vehicle while the shooting was going on[3] and then, (3) running south on Comstock with his companion while stuffing a large handgun into his waistband. In addition, a fourth eyewitness followed the two men, watched them hide their guns under a hedge and drive away in the grey car. He noted the number on the license plate (California license No. 534 TER) which information was given to the police. A grey Chevrolet bearing that license number was registered to the defendant. He was arrested about 3 p.m. that afternoon near his Pasadena home driving that vehicle.

The defendant, an Armenian, had come with his family from Lebanon some six and one-half years earlier. This fact, taken together with his expressed hatred of the Turkish people, Arikan's status as an official representative of the Republic of Turkey and, most importantly, a jailhouse confession by the defendant as to the motive, method and planning of the murder, served as the evidentiary basis for the jury's true finding on the special circumstance of "national origin."

---

[2]The defendant was identified as the man waiting on the south*east* corner of Wilshire and Comstock. His companion was observed waiting on the southwest corner. As we note below, two of the eyewitnesses who were unable to identify the defendant did identify his companion as one Krikor (KoKo) Saliba, a friend of the defendant. (See fn. 8, *post.*)

[3]As noted below, another witness although unable to positively identify the defendant, did testify that she saw the man on the passenger side of the victim's car actually firing his pistol from a "two hand stance" and "slightly crouched."

A. *Summary of the People's Case*

1. The Eyewitness Testimony

(a) *Genie Goetz* testified that at approximately 9:20 a.m. on Thursday, January 28, 1982, she was on her way to a class at UCLA and, driving north on Comstock, had stopped for the red light at the intersection with Wilshire. While waiting for the light to change so that she could proceed, she noticed a man she later identified as the defendant standing on the southeast corner of Wilshire and Comstock and another man standing on the opposite corner (i.e., the southwest corner of that intersection). In her testimony, she described their behavior as somewhat strange and that they were both standing very close to the street. In spite of the fact that they had a green light, they were making no attempt to cross the street but simply staring at each other (although the man on the west side of the intersection was also looking frequently up towards the nearby Beverly Comstock Hotel). She continued to observe the two men until the light for north-south traffic on Comstock changed. She then proceeded on across Wilshire to attend her class at UCLA. It was not until about 2 p.m. that afternoon that she heard anything about a "shooting" which had taken place at Wilshire and Comstock. That evening at approximately 9 o'clock, she telephoned the Los Angeles Police Department and informed them of what she had seen. Subsequently, on February 1, 1982, she was taken to a lineup at which time she picked out the defendant from a group of seven persons who had been made available for various eyewitness identification. She also identified the defendant at the preliminary hearing and at trial. In addition, she identified a blue vest (People's exhibit 37) as an article of clothing which the defendant had been wearing at the time she saw him. This was an item of clothing retrieved by the police from the defendant's brother.

(b) *James Jeffs* testified that he left his apartment on Ashton Avenue about 9:47 a.m., drove east on Ashton and then turned left and went north on Comstock towards the intersection with Wilshire. He stated that he stopped for the stop sign at the corner of Ashton and Comstock. It was at that time that he heard six shots, or what he thought were gunshots. He then saw two men running south on Comstock. One of them, wearing a blue vest or waist-length coat, was carrying a handgun in his left hand. Mr. Jeffs subsequently identified this man as the defendant. On February 1, 1982, he was taken to a lineup of six individuals. At that lineup he indicated that he "believed" that the defendant (No. 4 in the lineup) was the man he had seen running on January 28, wearing the blue vest and carrying a handgun in his left hand. On the same date, he made a second identification of the defendant out of a photo lineup and later identified the defendant at the preliminary hearing. He made a final identification of the defendant at the trial. When

asked what he meant when he said (at the original lineup) he "believed" that the defendant was the man he had seen, he described his certainty as a "high probability" and indicated that it could be quantified as a 70 to 80 percent probability.

(c) *Dawn Stensrud* was driving westbound on Wilshire and had stopped for the red light at the intersection with Comstock. While she was stopped, she heard a sound that "sounded like a pack of firecrackers going off." The sound was off to her left and she looked in that direction and saw a white Ford or Lincoln on Comstock heading north on the south side of Wilshire. The vehicle was stopped and there was a man on each side of the car. Just as her attention was directed to the car by the "firecracker" noise, she saw the man on the passenger side of the car start to run and go behind the car as the man on the driver's side turned. They met at the rear of the car and went south on Comstock. She then saw the white car slowly cross Wilshire, collide with a small red car and then crash into a tree. Photographs introduced at the trial depicted the bullet-riddled body of the victim Arikan slumped in the front seat of the white car as it rested against the tree. Just as the two men had started to run from the white car, she noticed the one on the driver's side putting something in his waistband. She was unable to identify what it was. She later identified the defendant as the man she saw on the passenger side of the car.[4]

A fourth eyewitness, *Wells Wohlwend,* an attorney, testified that he had been driving his car south on Comstock on the north side of Wilshire, intending to cross Wilshire. It was just before 10 a.m. and, as he came to the intersection, he heard what he characterized as "cracking noises." At first, he did not think they were anything other than some construction noises. However, as he crossed Wilshire, he saw two young men running very quickly. They were crossing from the east side of Comstock just south of Wilshire in a diagonal direction over towards the west side of Comstock and were running along the sidewalk. It struck him as very unusual and he followed in his automobile. He states that he got as close as 20 feet behind them. He described the two men as of medium height, dark hair, olive complected with "very athletic capability" because they were running very

---

[4]At the initial lineup, on February 1, 1982, she did not identify the defendant as one of the perpetrators but, in questioning by the People, explained that when she went to the lineup, she was expecting to identify the man on the driver's side and did not realize that the "No. 4" suspect in the lineup (i.e., Sassounian) was the one she had seen on the passenger side of the car until later that day when she examined clothing at the Parker Center Police Headquarters. When she viewed the light blue vest and tan cords, which the police had recovered, that jogged her memory and she realized that the No. 4 suspect had been the one she had observed on the passenger side of the vehicle. At that same time she correctly identified the defendant in a photo lineup. At the trial her identification of the defendant was firm.

fast. He saw the two men run south on Comstock and then turn and run west on Ashton Avenue. He observed them bending over a hedge area in front of a house and saw one of them kick at something in the hedge. He passed them, pulled into an alley area and continued to watch them. He observed them leave the hedge and go to a parked automobile. Mr. Wohlwend said that he then backed his car out of the alley and began heading east down Ashton towards the two men who, by this time, had entered their car and were driving towards him. He made no attempt to look at the faces of the men as they passed, but was intent on getting some sort of identification of the car. He noticed that there was no front license plate on the vehicle[5] but that there was a license plate on the back. He observed that license number and later wrote it down on a piece of paper. It was California license number 534 TER. That license was assigned to a grey Chevrolet, and was registered to the defendant, Harry M. Sassounian. Mr. Wohlwend then returned to the intersection of Wilshire and Comstock. At this time he still did not know that anything serious had happened. When he arrived at the intersection he observed a lot of activity and when the police arrived he told them what he had observed.

Three other witnesses testified and provided probative testimony, even though they were not able to make a positive identification of the defendant as one of the killers.

(a) *Valli Kaufhold* testified that on the morning of January 28, 1982, at a little before 10 a.m., she was walking south on Comstock on the north side of Wilshire. She was taking a baby that she took care of out for a walk. She crossed Wilshire Boulevard on the west side of Comstock and as she did so, she noticed two men standing on the southside of Wilshire, one of them on the east side of Comstock, and the other on the west side, next to the Beverly Comstock Hotel. They were standing about two car lengths south of the crosswalk. She noticed that they were standing across from each other and appeared to look at each other. She walked on past them and continued south on Comstock, past the intersection with Clubview Drive. She then heard a noise which "sounded like firecrackers just going off all the time." She turned around and looked back to the Comstock-Wilshire intersection, and saw one man holding a gun and shooting. She saw two shots come out of the end of the gun. She specifically remembered seeing the flash of light or fire coming out of the gun. The man shooting the gun was the one she had seen standing on the east side of Comstock[6] and he was holding his weapon "in a two hand stance" and "slightly crouched."

---

[5]Photographs of the defendant's vehicle (taken shortly after the car was impounded), which were introduced during the trial, reflected that the front license plate was missing. (People's exhibit 10.)

[6]As already noted, other witnesses positively identified this gunman as the defendant.

She could not see the other man who had been standing on the west side of Comstock. She continued walking slowly, pushing the baby carriage, but kept looking over her shoulder. She noticed that the two men were running south on Comstock toward her, and she was frightened for her own safety, and for the safety of the baby. She noticed both of the men with guns in their hands, and as they were running, she saw that they placed them in the waistband of their pants. The two men ran past her and turned west and went down Ashton Avenue, where they got into a grey car and left. She did not get the license number of the car, and could only describe it as a "medium sized" car. She was unable at a subsequent lineup to identify the defendant, but at a photo lineup, on the same day, she picked out the picture of one Krikor Saliba (an individual otherwise identified as a friend of the defendant, sometimes called KoKo), as the man she had seen standing on the west side of Comstock. She also recalls seeing a car following the two men as they were running, before they got into their own car and left. She continued walking and went around the block back to the intersection of Wilshire and Comstock, where she reported what she had seen to the police.

(b) *Harry Warrington,* an operating engineer, was working in front of the two apartment buildings that are located on the northwest corner of Wilshire and Comstock. He was approximately 300 feet from where the shooting of Arikan took place. It was a little before 10 a.m. when he heard sounds which resembled Chinese firecrackers. When he looked to the source of the sound, he saw two men in different positions around the white car on Comstock, on the south side of Wilshire. He then realized that shots were being fired into the car by the two men. As he looked up the man on the passenger side of the vehicle was by the trunk area of the white car and was starting to leave. When he came out from behind the car Mr. Warrington noticed that he had in his hand a large automatic pistol, and he was running. The man on the driver's side of the white car turned and took a step or two and then turned back "and did the final shots." It appeared to Warrington that the man actually had his arm inside the car and was shooting. Then the second gunman started running as well. The white car moved very slowly, at about two miles an hour, across Wilshire Boulevard and against the red light, struck a small red car, and crashed into a large eucalyptus tree on the northeast corner of Wilshire and Comstock. Mr. Warrington was unable to identify the defendant as one of the gunmen, but several days later when he was shown a photo lineup, he did make an identification of Krikor Saliba, as the gunman who he had seen on the driver's side of the white car. Mr. Warrington had with him a small "walkie-talkie" which he used to notify a secretary in his apartment building that a shooting had occurred and that she should call the police. He remained at the scene until the police arrived and told them what he had observed.

(c) *Lois Lian* had, between 9:40 and 9:45 a.m., stopped her car for a red light at the corner of Comstock and Wilshire. She was proceeding north on Comstock intending to turn right, and go east on Wilshire. She had driven through that same intersection about 10 minutes before, when she discovered, after leaving her nearby home, that she had forgotten her checkbook. She recalls that about 9:30 she was going east on Wilshire and had turned right on Comstock to return home. She testified that she did not recall seeing anything unusual in the intersection at that time. Upon her return, she noticed a young man standing a little south of the intersection of Wilshire on the east side of Comstock. There was no curb there, due to the existence of a construction fence. Mrs. Lian anticipated that the young man was going to cross the street, but when he did not do so, she made her right turn and proceeded east on Wilshire. When asked whether or not she could identify anyone in the courtroom as the young man she had seen standing on the corner about 9:45 a.m., she pointed out the defendant as someone who "very much resembles the man I remember seeing on the corner." However, she conceded that her identification was "not absolutely positive" and stated that in order for her identification to be positive, she would have had to have either spoken with the person or know them. She did not learn until several hours later that there had been a shooting at the intersection. After she saw the television reports of the crime, she realized that she had been at the intersection just a few minutes before it must have occurred. She called the police about 9 a.m. the next morning (i.e., on Friday, Jan. 29, 1982), and reported what she had observed.

## 2. Police Investigation and Arrest of the Defendant

(a) *Discovery of the Weapons.* After Mr. Wohlwend reported to the police what he had observed while following the two gunmen, including the license number of the grey Chevrolet, he pointed out to the police the area in the hedges on Ashton avenue where he saw the two gunmen bending over and kicking at something. As a result of this information, the police retrieved from the hedge areas a .45 caliber pistol and a .9 mm "Combat Commander" pistol. Latent fingerprint experts were *unable* to develop any fingerprints from either of these handguns.[7]

(b) *Autopsy of the Victim.* Dr. Donald Kornblum, acting chief medical examiner, conducted an autopsy on the body of Arikan, during the afternoon of January 28, 1982. Based upon that examination, he concluded that Arikan died as a result of multiple gunshots wounds. There were three entry wounds

---

[7]The testimony indicated that it had been raining off and on the morning of January 28, and that circumstance would have made recovery of any fingerprints difficult if not impossible.

in the face and head, and two in the chest, one of which pierced the heart. There was also a gunshot wound in Arikan's left knee. It was Dr. Kornblum's determination, that Arikan died within minutes after he was shot (he was pronounced dead at 10:05 a.m. on Jan. 28, 1982).

(c) *Arrest of the Defendant.* After obtaining the license number supplied by Mr. Wohlwend, the police determined that the vehicle, a grey Chevrolet, was registered to the defendant and that his residence was at 1375 Villa Street, in Pasadena. The police arrived at the defendant's residence around 12 noon, on January 28, and placed his home under surveillance. At a little past 1 p.m., deputy sheriffs going through the alley behind 1375 Villa, saw the grey Chevrolet (a 1977 Chevrolet Nova) with the license number 534 TER. These same sheriff's deputies after driving around the block, observed a white vehicle parked in front of 1375 Villa, with a single male driver honking the horn. One of the deputies identified the driver as "KoKo" Saliba, and a few minutes later they saw the same car, at the rear of the residence near the garage area again honking its horn.[8] A little after 3 p.m. on January 28, police officers observed the defendant leave his home driving the grey Chevrolet. The car was stopped and the defendant was placed under arrest.

(d) *Other Physical Evidence.* On the evening of January 28, 1982, the police conducted a search of the defendant's home, and recovered, among other things, photographs depicting the defendant, dressed in military fatigues, holding and aiming a semiautomatic weapon and two handguns, which resemble (but there is no contention that they are the same) the two weapons found at the scene of Arikan's murder. In addition, various items of clothing were later recovered upon which certain chemical tests were made. The police spoke with the defendant's brother, Ara Sassounian, and obtained from him a blue ski vest or parka which was identified by the witness Genie Goetz, as the one she saw the defendant wearing on the morning of January 28, 1982. Ara Sassounian told police that he and his brother often exchanged clothing, and that he had found the blue ski vest lying on a bed when he came home from school on the afternoon of January 28, 1982.[9] Ara Sassounian also indicated to the police that he had bad feelings towards the Turkish people for the things that they had done in the

---

[8]For reasons not disclosed by the record, Krikor Saliba was not apprehended. The testimony at trial established that Saliba had not been seen by his family since January 28, 1982.

[9]Ara Sassounian, called as a witness for the prosecution, testified that his family had come to the United States, from Lebanon, six and one-half years earlier, and that the defendant had never permitted anyone else to drive his car. He again confirmed that he had put the blue vest on after he came home from school on the afternoon of January 28, but this time he said that he found it hanging in the closet, rather than laying on the bed as he had earlier stated to the police.

past, and stated that Turks were animals. He further stated that his brother, the defendant, felt the same way.

(e) *Chemical Residue Tests*. Gunshot residue and hydroxy guinoline tests were performed on the defendant's hands as well as on the several items of clothing which the police had recovered. The hydroxy guinoline test was negative, showing merely that the defendant *could* have been holding metal, but revealing no distinct pattern. The gunshot residue tests, according to the People's expert, is more accurate and dependable than the hydroxy guinoline tests, and that test detected gunshot residue on the defendant's left hand. No gunshot residue was detected on the defendant's right hand.[10] The expert testified that a finding of gunshot residue is consistent with the subject having recently fired a gun. The same expert also sampled a pair of brown Levi corduroy pants, in order to test them for gunshot residue. A number of particles in the waistband were found consistent with gunshot residue.

(f) *Fingerprint Evidence*. As already noted, the latent fingerprint experts from the Los Angeles Police Department were unable to develop any fingerprints on either of the two handguns found at the scene. Examination of the grey Chevrolet, bearing license number 534 TER did, however, produce fingerprints belonging to both the defendant and "KoKo" Saliba.

(g) *Ballistics Evidence*. Arleigh McCree, a detective with the Los Angeles Police Department, testified at the trial as a firearms expert. He provided evidence of both ballistics and trajectory analysis. He testified at length regarding his expert qualifications and no issue was made with respect thereto.[11]

McCree identified the .45 caliber handgun found in the hedge on Ashton Avenue. He stated that when found it was fully loaded with the hammer on full cock, and the safety off. There was a single round or cartridge in the chamber, but the magazine, capable of holding seven cartridges, was empty. The gun was test fired to compare test shots with evidence casings and bullets which had been recovered from the scene of Arikan's murder.

He also identified the .9 mm weapon and its accompanying magazine. It had been found also fully cocked and there was a live cartridge in the chamber, but the magazine was empty. The magazine in the .9 mm weapon was designed to hold nine cartridges. He similarly test fired this weapon in

---

[10]The witness Jeffs testified that when he saw the defendant leaving the scene, he was carrying a handgun in his left hand.

[11]However, the defendant did object to one of the opinions reached by McCree relating to the so-called "stall man" technique allegedly used by assassins, on the grounds that it was not properly supported, and amounted to mere speculation. (See fn. 14, *post*.)

order to make a comparison with the cartridge casings and bullets recovered from the crime scene.

After examining the casings found at the scene and comparing them with the casings produced by the test firings, McCree was able to determine that *all* of the .45 casings had been fired from the .45 caliber weapon found on Ashton Avenue, and *all but one* of the .9 mm casings had been fired from the .9 mm weapon found at the scene. McCree had some doubt as to this last casing because of its mutilation, and he was not able to make a positive identification. The casings which were compared included not only those found on the street where the shooting took place, but also those recovered from the interior of Arikan's car.

In addition, McCree testified that of the bullets and bullet fragments removed from Arikan's body at the autopsy, one .9 mm bullet was fired from the .9 mm Colt Commander, and one .45 caliber bullet was fired from the .45 Colt automatic pistol.[12]

McCree examined the Arikan vehicle and, from the various bullet holes that he found in the car, he was able to establish the trajectory of each of the shots fired which impacted the exterior and/or interior of the vehicle. For example, he was able to determine that the gunman using the .9 mm pistol was on the driver's side of the Arikan vehicle, and the person using the .45 caliber handgun was on the passenger side. He further expressed the opinion that the sequence of the shooting began with shots fired as the vehicle approached the intersection of Wilshire and Comstock, and continued as Arikan's vehicle slowly passed where the gunman had been standing (and/or the gunmen themselves moved to the rear of the vehicle as they were firing).[13]

---

[12]With respect to the remaining bullets and bullet fragments, positive tracing to either of these two weapons was not possible due to shattering and mutilation.

[13]McCree testified, that it was his opinion that the first shot fired from the .45 caliber gun (i.e., by the gunman on the passenger side of the Arikan vehicle) was fired while the vehicle was still several feet away by a person standing in a crouch. The trajectory of this bullet was very flat, struck the vehicle on the hood about six inches short of the windshield on the driver's side and richocheted off the windshield. That bullet was not recovered. He stated that the second shot which also hit the hood (although this time the front part of the hood) was at much sharper angle indicating that the gunman was much closer to the front of the vehicle. Both of these shots were fired by someone standing in front of the Arikan vehicle on the right side and almost directly in front of the right headlight. The next bullet from the .45 caliber handgun was apparently fired at right angles to the front door and in fact the bullet was found imbedded in the top of the door. Two .45 caliber bullets entered the body of Arikan. The next bullet apparently fired was from somebody standing beside the right rear door as the bullet entered the headrest on the top of the front passenger seat. Finally, a bullet apparently entered the door frame between the front and rear doors and was fired at an angle indicating that the weapon was then towards the rear of the vehicle.

McCree expressed the opinion that the gunman armed with the .45 caliber pistol had commenced firing as the vehicle approached and continued firing as the vehicle slowly went past him. This was consistent with eyewitness testimony indicating that the gunman, identified as the defendant, was coming around from the rear of the vehicle as the shooting stopped and then ran south on Comstock. This was also consistent with the testimony of the witness Valli Kaufhold who saw the gunman on the east side of Comstock fire two shots from a crouched two-hand firing position.

Finally, McCree testified that in his opinion the gunman on the east side of Comstock was acting as a "stall man," a tactic often used by assassination teams to get a vehicle to slow or stop so that an attack will more likely be successful. He learned of this tactic in conversations with police officers in foreign countries.[14]

### 3. The Defendant's Confession

Although the defendant made no formal statement to the police, evidence was introduced at trial regarding a statement which he made to another jail inmate at the time that he was being held in the Los Angeles County jail awaiting trial. This testimony came from one Jeffrey Busch (herein Busch). Busch testified that while he was in the Los Angeles County jail in February or March 1983, awaiting transfer to the state prison at Chino, California, he met and had a conversation with the defendant. Busch was unable precisely to pinpoint the time when this took place. He stated that it was sometime in February or early March but prior to March 18, 1983 when he was transferred to Chino.[15] During this period of time, Busch was a so-called "khaki trustee" and had relative freedom of movement in the jail during the hours from 5 a.m. to 9 p.m.

Busch testified that he and another trustee, Danny Gruytch (herein Gruytch), were selling cigarettes and candy to inmates awaiting transfer to various court hearings. This was on the first floor of the Los Angeles County jail in the so-called "court line" area.[16] Busch states that he approached

---

[14]The defendant raised strong objections to the expression of this opinion and the court indicated, in reliance upon the representation by the People that a witness would place the gunman on the east side of Comstock in front of the car when the shooting began, that it would permit the opinion to be expressed. Subsequently, the witness Kaufhold did *not* so testify, although the prosecutor indicated that she honestly believed that that was the testimony Ms. Kaufhold was going to provide. When she did not so testify, the defendant made a motion for a mistrial which the court denied.

[15]Subsequently, it was established that this conversation could only have occurred on February 14, 1983. (See fn. 33, *post.*)

[16]Busch concedes that this was in violation of the rules of the sheriff regarding the permitted activities of trustees. Trustees were not permitted to sell cigarettes or anything else to inmates or to engage in any financial transactions with them whatsoever.

the defendant, who was then alone in an open cell (i.e., one with a one-way turnstile and open bars rather than a solid steel door), and asked him if he wanted to buy any cigarettes. He stated that the defendant identified himself as "Sassounian" and asked if he (i.e., Busch) knew anything that would help him with his case.[17]

---

[17]The most critical testimony by Busch with respect to his conversation with the defendant is as follows:

"THE WITNESS: He asked me if I knew anything that would be helpful to him in his case, and I asked him what kind of a case did you have.

"Q. BY MS. RUBIN: What did he say?

"A. He said he had a 187 murder.

"Q. And what was the next thing that happened?

"A. I said, 'Well, I need to know a little bit about the case before I can tell you anything.' And he told me everything about it.

"Q. Now, before we get to that, where was Mr. Gruytch in relation to where you were when this conversation started with Mr. Sassounian?

"A. A couple of feet away from me.

"Q. Behind you or in front of you?

"A. Behind me.

"Q. And after you told Mr. Sassounian you needed to know a little bit more about the murder, what, if anything, did he say?

"A. He said that him and two of his partners killed a Turkish Consul member and that they were working for an organization called The Justice Commandos.

"He then stated that the reason why he did it was a political—it was a revenge.

"And I said, 'Well, I need to know a little bit more.'

"So then he did say that he followed the guy around, him and his partners followed the guy around for a couple of days to get his pattern down to see wherever he went.

"Then after they got the pattern down, they said they decided to make it look like a big assassination.

" . . . . . . . . . . . . . . . . .

"Q. You earlier mentioned something about a group called The Justice Commandos. What did Mr. Sassounian say about that?

"A. He said it was an organization like a terrorized group, that—what is the question you wanted to know? What kind of a group it is?

"Q. No.

"I wanted to know what he said about The Justice Commandos.

"A. It was a terrorize group.

"Q. And did Mr. Sassounian say why they killed this Turkish Consul?

"A. To get revenge.

"Q. For what purpose?

"A. Because a lot of his people were killed by the Turkish Government and he wanted to get a political—I'm trying to remember the exact words that he said.

"Q. Did he say anything—or use the word 'publicity'?

"A. Publicity.

"Q. What did he say about publicity?

"A. He said he wanted to get publicity so he would get revenge on what the Turkish people did to his people.

"Q. Did Mr. Sassounian say anything about what he would do if he had to do it all over again?

"A. He said he would do it all over again in the same style.

"Q. I'm sorry?

"A. He said he would do it all over again in the same style and manner if he had to for his people.

"Q. In the same style?

"A. Yes."

When Busch indicated to the defendant that he needed more information in order to answer the defendant's inquiry, the defendant indicated that he was charged with murder and that it involved the assassination of the Turkish Consul in Los Angeles and that it was a revenge killing which he and others had planned and carried out as part of their involvement with the "Justice Commandos." It was an act of revenge against the Turkish people for what they had done years before to the Armenians. The defendant also described to Busch the weapons that were used, the number of persons involved and confirmed that they had spent sometime in surveillance of their victim in order to determine the best time and place to carry out the assassination.

This meeting, if not the entire conversation, is corroborated by the other trustee, Gruytch. He testified to the same facts as Busch, except that he did not hear defendant's entire statement. After he heard a reference to murder, he stepped away so that he would not become involved and did not hear anything that the defendant said after the defendant admitted being charged with the crime of murder. However, Gruytch's testimony does support Busch's testimony as to the fact of the meeting itself, that the defendant was in fact accessible and the general circumstances under which it occurred. This was important in light of the defense's assertion that the meeting could not possibly have taken place since the defendant had never been left in a cell such as the one described by Busch and Gruytch during the time that they say the meeting occurred.[18]

Busch testified that he did not speak with anyone in authority about his conversation with the defendant until late May 1983 when he mentioned it to one of the correction officers at Chino, who apparently got in touch with the Los Angeles Police Department. ■ ■■■■■ A Sergeant Engquist of that department had an initial meeting with Busch at Chino on June 1, 1983.[19] Subsequent to that meeting, Busch had a conversation with another

---

[18]Both Busch and Gruytch separately testified that they had not spoken or communicated in any way after March 18, 1983 (except for a letter which Gruytch sent to Busch in April of 1983 which did not in any way relate to the conversation with the defendant). Gruytch was transferred to Nevada authorities sometime in March and was in custody himself at the time that he testified. Busch was transferred to Chino on or about March 18, 1983. Both insisted that neither had spoken or communicated with the other prior to the giving of their testimony and neither was present during the giving of the testimony of the other. At the time of his testimony, Busch was an inmate at Chino and was awaiting release on parole in early 1984.

[19]Thus, Busch's first contact with law enforcement regarding the defendant's confession was over three months *after* he and the defendant spoke. Moreover, there was no suggestion in the evidence that he had been encouraged or assisted by the police in making contact with the defendant. In our view, these facts are sufficient to prevent the application of the rule of *Maine* v. *Moulton* (1985) 474 U.S. 159 [88 L.Ed.2d 481, 106 S.Ct. 477] to this case. The use of Busch's testimony by the People against the defendant did not constitute a violation of any Fifth or Sixth Amendment rights of the defendant. (See also *People* v. *Whitt* (1984) 36 Cal.3d 724, 742-743 [205 Cal.Rptr. 810, 685 P.2d 1161].)

Chino inmate known as "W.W." in which he asked what "W.W." knew about the "Justice Commandos" and what other acts they claimed to have committed. Busch states that he wanted to find out what he was getting into. He decided to put down in writing what he recalled of his conversation with the defendant and he included thereon some information which "W.W." gave him regarding other assaults on Turkish diplomats or embassies in Toronto, New York and London. This writing, introduced in evidence as People's exhibit 50, represented a recollection by Busch of the things that the defendant had told him as well as the "credits" of the Justice Commandos which he had obtained from "W.W."[20]

Busch next spoke with Engquist on June 23, 1983, and at that time was unable to pick the defendant out of a photo lineup. However, he was able to identify the defendant during the trial. Busch conceded during his testimony that he had sent a letter on July 1, 1983, to Engquist making several requests for special treatment and privileges but he admitted that none of those were honored and that he had not received any of his requests. ██ ██ ██ ██ Busch also admitted that he had acted as an informant[21] in another case in Orange County about one year before.

### B. *Summary of the Defense Case*

The defendant did not himself testify, but he offered evidence in support of three theories of defense:

(1) *Mistaken Identification.* The defendant called four witnesses who were present at the intersection of Wilshire and Comstock at or about the time when the murder of Arikan took place. None could identify the defendant as one of the gunmen, and provided descriptions, neither of which resembled the defendant. Indeed, one of those witnesses, Judith Jones, positively testified that the gunman who had been standing on the southeast corner of the intersection was *not* the defendant;

(2) *Alibi.* Two witnesses were called whose testimony placed the defendant in Pasadena (an approximate 40-minute drive from the murder scene) at a food market between 10:20 a.m. and 10:40 a.m. on January 28, 1982. A third witness testified that she was having breakfast with the defendant in Pasadena from approximately 9 a.m. to 10 a.m. on that morning;

---

[20]The defendant objected to the introduction of exhibit 50 on hearsay grounds. However, this objection was overruled. (See fns. 39 and 40, *post.*)

[21]Or, as counsel for defendant referred to him during the trial, a "jailhouse snitch." Although Busch's testimony was clearly accepted by the jury, there seems little doubt that the trial judge was troubled by the use of informants to provide such critical testimony. However, he concluded, correctly in our view, that the issue was one of credibility for the jury to decide.

(3) *Rebuttal to Busch.* The defendant called four present or former incarcerated felons who, in essence, testified that Busch had fabricated his testimony about the defendant's jailhouse confession in order to secure a better deal for himself, that he was a notorious liar and that he was a repeat informer and, in fact, was known as "King Snitch."

By its verdict it is clear that all of this testimony was rejected by the jury.

### C. *The Verdict and Sentence*

On January 4, 1984, the jury returned its verdict of guilty on the charge of violation of Penal Code section 187 (murder in the first degree) and found as true the special circumstance charged under Penal Code section 190.2, subdivision (a)(16) relating to the victim's "nationality" or "country of origin."[22] The jury was unable to reach a verdict on the alleged special circumstance of "lying-in-wait" (Pen. Code, § 190.2, subd. (a)(16))[23] or the charge that the defendant had "used a gun" in the commission of the

---

[22]About two hours before they returned with their verdict, the jury sent out two questions which the court read, as follows:

[1] "If the defendant was not the actual killer with the gun, but was involved in the crime, can he be considered to have killed the victim as stated in the special circumstance of nationality and country of origin in that he was a Turkish National?

[2] "Also if we can agree on a verdict, but cannot agree on any of the special circumstances, what would our procedure be?"

"That's signed '4th day of January, 1984, by David Castillo, Foreman.'"

After conferring with counsel, the court responded to the jury as follows:

"[THE COURT:] You have asked two questions. I am going to answer the second one of these two questions you have asked, and that question is:

"If we can agree on a verdict, but cannot agree on any of the special circumstances, what would our procedure be?

"Your procedure would be to return that verdict to me and I will take over from there.

"The first question I'm not quite sure I understand it. I know that sounds strange, but I really am not sure I understand exactly the point that you're driving at in the question, and so I'm going to ask you to go back in and read over that question in light of your discussion, and try to ask it again so that I understand it. I'm not sure that I understand quite what you are focusing on, and I don't want to answer something you are not asking.

"So with that I am going to ask you all to go back in, in light of what I have just told you, okay. You may retire and send me another question, if you have one.

"Do you want your question back?

"MR. CASTILLO: Yes, That way we can reword it.

"THE COURT: Okay."

The jury returned with their verdict at 3:53 p.m. on January 4, 1984, without submitting any further questions.

[23]During its deliberations (on Dec. 28, 1983) the jury sent out a question regarding this special circumstance: "We need to know if lying-in-wait means actually physically hiding behind something."

The court answered this question on January 3, 1984, after extensive discussion with counsel: "The short answer to that is No, Okay."

crime (Pen. Code, § 12022.5).[24] One week later, during the penalty phase trial, the court received a note from juror Dylane Rankins, which stated:

"1-11-84.

"Your Honor, is it too late to change my vote on one of the special circumstances? On Wednesday, 4th, I was ill. I was unable to think clearly because of my illness and the pressure from the other jurors. Now my sickness is over, except for the coughing. I can think clearer. I feel I have made an error. *Also based on some evidence that was brought out in our deliberations that wasn't evidence brought out in court.*" (Italics supplied.)

As a result of this disclosure, the court conducted a separate in-chambers interrogation of each of the 12 jurors. This interrogation began with Ms. Rankins, who elaborated upon what she was referring to in her note. She referred to some statement that was made by a female juror, whose name she did not recall, concerning a telephone call made to the Turkish consul.[25]

---

[24]At the time the jury returned the guilty verdict, the foreman (Juror Castillo) advised the court that the jury was split 11 to 1 on each of these allegations. He further stated that that split had held consistently for five of the six ballots which had been taken on the issues, and that further deliberation was not reasonably likely to result in a verdict. The other jurors each concurred and the court declared a mistrial as to those two allegations.

[25]The relevant portions of her *in chambers* testimony are as follows:

"THE COURT: Now, let me make sure that we all understand what the statement was.

"Someone said there was a threatening phone call made to the Turkish Consul?

"Ms. RANKINS: Yes, before the assassination.

"THE COURT: Before the assassination?

"Ms. RANKINS: Yes. But at that time I thought—I don't know what I was thinking—that it must have been brought out in court.

"And I realized, I don't really remember that as I start to think. And if I based my decision on that, I felt I did wrongly in doing so.

"THE COURT: Well, who said that, do you remember?

"Ms. RANKINS: I don't remember, but I know it was a female. I don't remember because it was so much discussion and confusion going on. And I can't remember the person.

"THE COURT: Okay. Now—so, after that statement was made that there was a threatening phone call made to the Turkish Consul before the killing—

"Ms. RANKINS: Yes.

"THE COURT:—then you changed your vote on that basis?

"Ms. RANKINS: Yeah. I said, well, I couldn't think of any other reasonable doubt, because that sort of kind of helped me make the decision to be more reasonable.

" . . . . . . . . . . . . . . . . . . . . . .

"MR. GERAGOS: Now, do you remember when it was that this idea, the threatening phone call being made to the Turkish Embassy, in your deliberations, when did that come up?

"Ms. RANKINS: We were discussing on the special circumstance about the nationality.

"MR. GERAGOS: So, it wasn't the same day that the verdict came in or was it? Was it that

Eight of the other jurors had no recollection whatever of any mention of such a phone call. The remaining three jurors had some recollection about it but emphasized that it was not discussed or considered by the jury and even Ms. Rankins conceded that that was the case. The court denied the defendant's motion for a mistrial and the companion motion to set aside the verdict on the grounds of jury misconduct. The court found that there was no jury misconduct. The court also concluded that after the recordation of a verdict, whether or not the jury has been discharged (in this case, because of the penalty phase trial, it had not been discharged), a juror may not change his or her vote on a verdict.

The jury, after hearing evidence in the penalty phase trial, returned a verdict of life without possibility of parole. That sentence was thereafter imposed by the court on June 15, 1984. This appeal followed.

### CONTENTIONS ON APPEAL

The defendant asserts six principal contentions on appeal:[26]

1. That there was prosecutorial misconduct with respect to (a) representations to the court regarding certain anticipated evidence, (b) cross-ex-

---

day?

"Ms. RANKINS: I really can't remember if that was the day or not.

"MR. GERAGOS: Was it discussed more than once.

"Ms. RANKINS: I believe only once it was brought up.

"MR. GERAGOS: Did that person say where they got that information?

"Ms. RANKINS: No, they didn't say.

"MR. GERAGOS: And did the other jurors agree with that or ask about that?

"Ms. RANKINS: No, no one said anything. It was just sort of brought out in an outburst like.

"MR. GERAGOS: And you felt that that information swung you to the other side, is that right?

"Ms. RANKINS: Yes.

" . . . . . . . . . . . . . . . . . . .

"Ms. RUBIN: This issue that you say that was brought up during deliberations about a phone call, a threatening phone call, was it discussed among the other jurors?

"Ms. RANKINS: No. It was just brought up.

"Ms. RUBIN: Just one person said something about a phone call and that was that?

"Ms. RANKINS: Yes, I believe that's what it was.

"Ms. RUBIN: And there was no further discussion about it afterwards?

"Ms. RANKINS: No.

"Ms. RUBIN: At the time that that was brought up didn't one of the jurors say 'We're not supposed to talk about anything that wasn't brought up in court'?

"Ms. RANKINS: No.

"Ms. RUBIN: So, basically, someone got up and said something, and then that was the end of that?

"Ms. RANKINS: Yes.

"Ms. RUBIN: Did you ask that person any questions about it?

"Ms. RANKINS: No. I didn't."

[26]The defendant expressly eschews any claim that the jury's guilt verdict is not supported by substantial evidence within the meaning of the rules set forth in *People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].

amination of defense witnesses, (c) alleged destruction of a certain jail record, and (d) final argument;

2. That there was jury misconduct arising from the receipt and consideration of matters not admitted into evidence and that the People failed to rebut the prejudice arising therefrom;

3. That the trial court erroneously admitted into evidence irrelevant and prejudicial matter;

4. That the trial court made three instructional errors in that (a) it gave an improper aiding and abetting instruction, (b) it improperly submitted a lying-in-wait instruction, and (c) it failed to give an instruction on circumstantial evidence as requested by the defendant;

5. That the special circumstance (Pen. Code, § 190.2, subd. (a)(16)) finding was improper in that (a) there was insufficient evidence to support it, (b) the trial court failed to instruct the jury on the requirement of a corpus delicti showing with respect to such circumstance, (c) the special circumstance relating to the "national origin" of the victim is unconstitutionally vague and (d) the trial court at the time of sentencing improperly failed to rule on the defendant's motion to strike the special circumstance; and

6. That there was a systematic exclusion of fair and impartial venire persons from the jury in violation of the Constitutions of both the United States and California.

We discuss each of these contentions and conclude that they are without merit. We therefore affirm the judgment.

## DISCUSSION

### A. *Claimed Prosecutorial Misconduct*

The defendant urges upon us four separate examples of what he argues was improper and prejudicial prosecutorial misconduct which deprived him of a fair trial. ■ "Prosecutorial misconduct implies the use of deceptive or reprehensible methods to persuade either the court or the jury." (*People v. Haskett* (1982) 30 Cal.3d 841, 866 [180 Cal.Rptr. 640, 640 P.2d 776]; *People v. Strickland* (1974) 11 Cal.3d 946, 955 [114 Cal.Rptr. 632, 523 P.2d 672].) ■ "It is not necessary to show bad faith, but it is necessary to show the defendant's right to a fair trial was prejudiced [by the claimed misconduct]." (*People v. Epps* (1981) 122 Cal.App.3d 691, 706 [176 Cal.Rptr. 332].) "The ultimate question to be decided is, had the prosecutor

refrained from the misconduct, is it reasonably probable that a result more favorable to the defendant would have occurred." (*People* v. *Haskett, supra,* 30 Cal.3d 841, 866; *People* v. *Strickland, supra,* 11 Cal.3d 946, 955.) With these principles in mind we examine the acts of misconduct cited by the defendant.

### 1. Expert Opinion

The defendant first argues that Detective Arleigh McCree, was erroneously permitted to give his expert opinion regarding the so-called assassination "stall man" technique. The defendant objected on grounds that there was no evidentiary basis for such an opinion, that it was beyond McCree's expertise, and was speculative and argumentative.

Detective McCree testified, in part, that the shooting of Arikan was facilitated by a "stall man" technique which involved one assailant stepping in front of the car and forcing the vehicle to stop, thus providing a stationary target. He stated that his opinion was based upon the anticipated testimony of certain eyewitnesses (whom he had not personally interviewed), as well as upon discussions with other police officials concerning assassinations where multiple subjects have acted in unison.

The court permitted the testimony over the defendant's objection, because (a) it believed that it was relevant to the issue of intent to kill; and (b) it understood that a witness was going to testify that a man had been observed in front of the victim's car prior to the shooting. The record discloses that no such witness was ever produced. The prosecutor stated that she had been honestly mistaken with respect to that expected testimony.[27] Defendant subsequently moved for a mistrial on this ground which was denied.

Conceding for the sake of argument that the admission of such testimony was error (but see fn. 28, below, where we point out that a basis for the opinion *did* exist in the ballistics evidence itself), was it prejudicial to the defendant? Before there can be a reversal for a conviction based upon the erroneous admission of evidence, an appellate court must be able to conclude that it is reasonably probable that in the absence of the erroneously admitted evidence, a result more favorable to the appealing party would have been reached. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Based upon the record, it is impossible for this court so to conclude.

---

[27]There was no evidence, nor did the trial court find, that the prosecutor had not made this representation to the court in good faith.

The intent of the defendant, to which this particular opinion testimony was most relevant, seems clearly established by the eyewitnesses who placed him at the corner of Comstock and Wilshire at the time of the shooting (and for some time prior thereto) with a large handgun in his possession. This testimony, taken together with the evidence of the shooting itself (including the ballistics evidence), clearly justifies (if not compels) the inference that the defendant and his companion were waiting for Arikan to stop at the corner on his way to work. The jury was justified in concluding that the defendant intended to kill his victim and whether or not a "stall man" technique was actually used is not particularly material. Such expert testimony certainly added nothing to the People's case which was not already firmly established by other credible and admissible evidence.[28]

### 2. Cross-examination of Defense Witnesses

The defendant argues that the prosecutor was guilty of misconduct in the cross-examination of defense witnesses Charles Laughlin (herein Laughlin) and B. L. Bradford (herein Bradford).

Laughlin testified that he had originally been part of a plan with prosecution witness Busch to incriminate the defendant in the murder of Arikan in return for anticipated prosecution favors. According to Laughlin, he gave Busch certain newspaper clippings which Busch was then to use as the basis for fabricating the testimony which implicated the defendant in the crime.[29] Laughlin testified that Busch, in fact, had no knowledge regarding any admission by the defendant and had fabricated his testimony.

Laughlin was vigorously cross-examined by the prosecutor and some of that inquiry went into matters[30] which were admittedly beyond the permis-

---

[28]Moreover, the testimony of Detective McCree regarding the trajectory of the various bullets fired from the .45 caliber handgun (identified to be in the possession of the defendant) indicates that two of them, presumably the first two fired from that gun, established that the defendant initially *was* at the right front of Arikan's car. (See fn. 13, *ante*.) This conclusion, which was fully supported by the physical evidence and was consistent with the testimony of the eyewitnesses would have been sufficient, in any event, to serve as a basis for McCree's opinion that initially the "shooter" on the passenger side of Arikan's car had been in the front of the car in order to stop it.

[29]As noted elsewhere, Busch testified that the defendant admitted to him, that he had in fact participated in the murder of Arikan, and that it was a revenge killing done by the "Justice Commandos."

[30]Without going into the examples contained in the record it is sufficient to note that the questions asked by the prosecutor related to alleged prior misconduct on the part of the witness Laughlin that did *not* constitute convictions of felonies, nor evidence of reputation for lack of veracity of untruthfulness. The court permitted several of these questions over the objection of the defendant.

sible scope of Evidence Code section 787.[31] However, an examination of the entire record sustains the People's position that such error on the part of the trial court was harmless. The record reflects that overwhelming proper impeachment evidence was provided by the fact of Laughlin's prior felony conviction record, and by the concessions which he made that he had repeatedly lied to police officials with respect to his knowledge of *this* particular case. Laughlin was impeached by proper questions directed to his admitted falsehoods to nearly every representative of law enforcement who contacted him in this case.

 Bradford testified that Busch admitted to him that the testimony which Busch had given with respect to the confession of the defendant was false. In cross-examination, Bradford was asked about (a) pending charges for rape to which the court sustained the defendant's objection and (b) a prior felony conviction for grand theft auto, which, as it ultimately turned out, was apparently a juvenile conviction. The record reflects that the prosecutor's position was that she reasonably believed, at the time she asked that question, that it had been an adult conviction, and that, in any event, the provisions of Proposition 8 permitted impeachment with a juvenile conviction. (See, e.g., *In re Javier A.* (1984) 159 Cal.App.3d 913, 964, fn. 46 [206 Cal.Rptr. 386].)

Given such circumstances, this court cannot conclude that the prosecutor acted in bad faith. In any event, this was only a small part of an extensive cross-examination of a witness who, by his own admission, was himself incarcerated awaiting trial on criminal charges. The jury could well have had reason to suspect his motives. Whatever error there may have been in asking this question was clearly harmless. Since the court sustained the

---

[31]Evidence Code section 787 provides: "Subject to Section 788, evidence of specific instances of his conduct relevant only as tending to prove a trait of his character is inadmissible to attack or support the credibility of a witness."

Evidence Code section 788 provides: "For the purpose of attacking the credibility of a witness, it may be shown by the examination of the witness or by the record of the judgment that he has been convicted of a felony unless:

"(a) A pardon based on his innocence has been granted to the witness by the jurisdiction in which he was convicted.

"(b) A certificate of rehabilitation and pardon has been granted to the witness under the provisions of Chapter 3.5 (commencing with Section 4852.01) of Title 6 of Part 3 of the Penal Code.

"(c) The accusatory pleading against the witness has been dismissed under the provisions of Penal Code Section 1203.4, but this exception does not apply to any criminal trial where the witness is being prosecuted for a subsequent offense.

"(d) The conviction was under the laws of another jurisdiction and the witness has been relieved of the penalties and disabilities arising from the conviction pursuant to a procedure substantially equivalent to that referred to in subdivision (b) or (c)."

defendant's objection to the question about pending charges of rape, the defendant cannot claim to have been prejudiced by that question.[32]

### 3. Alleged Destruction or Suppression of a Jail Record

The defendant argues that the prosecution was guilty of misconduct by the "willful" destruction of a crucial defense document, a jail record indicating that on February 14, 1983, the defendant was located in a cell, in the Los Angeles County jail, which prevented him from having any contact with prosecution witness Busch.[33] It was this confession to Busch that provided the principal evidence against the defendant, with respect to the "national origin" special circumstance which the jury later found to be true. The defendant claims that this particular jail record (reflecting that the defendant was in a "closed" rather than an "open" cell on the day when Busch claimed to have spoken with him) would have indicated that it was impossible for Busch to have had the conversation which Busch claims resulted in the defendant's confession.

The defendant asserts that this record was willfully suppressed by the People and that the trial court should have (a) declared a mistrial (because the absence of the record was unknown to the defense at the time when Busch was testifying) or (b) given the jury a directive instruction regarding the contents of the record. (See, e.g., *People v. Zamora* (1980) 28 Cal.3d 88, 102-103 [167 Cal.Rptr. 573, 615 P.2d 1361].)

However, this argument fails for at least three reasons:

(a) The absence of the jail record could not have prejudiced the defendant, since all the information which the document could have provided was in fact supplied by the testimony of a deputy sheriff who recalled the record and what it said. In other words, the defense was able to present uncontradicted evidence as to the existence *and* content of the missing record;

(b) There was no evidence that the record had been willfully destroyed. A number of the records relating to the "court line" for February 14, 1983, were missing, not just the record referring to the defendant. At most, the sheriff was negligent;

---

[32]The record reflects that defendant's counsel was not sufficiently concerned about the question regarding pending rape charges to even ask for a cautionary instruction to the jury and none was given. It appears that, as a matter of trial tactics, he expressly *declined* the trial judge's invitation to request that some instruction be given.

[33]The record herein reflected that February 14, 1983 was the only court appearance which the defendant had between November 5, 1982 and May 3, 1983. The parties stipulated to these facts and the jury was so advised.

(c) The jury was specifically instructed, *at the defendant's request,* that if it believed that the People *had* willfully suppressed the record, then there was a presumption that the record if produced would be unfavorable to the People.

It is clear from the jury's verdict that it chose not to draw that inference. It obviously believed the testimony of Busch, and that whatever the missing jail record may have said, Busch and the defendant did in fact have a conversation on February 14, 1983. This conclusion is further supported by the testimony of prosecution witness Gruytch. He testified that he saw Busch and the defendant talking together and recalled the subject of their discussion to be the offenses with which the defendant was charged. Testimony from deputy sheriffs called by both the People and the defendant indicated that it was certainly possible for Busch to have communicated with the defendant on February 14, 1983, in spite of rules which prohibited such conversations and in spite of a document which indicated that defendant had been assigned to (but not necessarily placed in) a closed cell. On this record, the jury certainly could have believed that Busch and the defendant did in fact speak and that to the extent that the missing jail record indicated that the defendant had been locked up where Busch could not speak with him, it was in error.

 When substantial material evidence has been lost or destroyed sanctions may be appropriate, but the imposition and mode of sanctions depend upon the circumstances attending the loss or destruction of the evidence. (*People* v. *Hitch* (1974) 12 Cal.3d 641, 650 [117 Cal.Rptr. 9, 527 P.2d 361].) The trial court is invested with a large measure of discretion to determine the appropriate sanction. (*People* v. *Zamora, supra,* 28 Cal.3d 88, 99.) In the absence of bad faith, that sanction should not be more than is necessary to insure the defendant a fair trial. (*People* v. *Bailes* (1982) 129 Cal.App.3d 265, 272-273 [180 Cal.Rptr. 792]; *Brown* v. *Municipal Court* (1978) 86 Cal.App.3d 357, 363 [150 Cal.Rptr. 216].)

 Here, the court instructed the jury that *if* it found that the sheriff had willfully "lost" or destroyed the jail record it could presume that such record was unfavorable to the People's case. Nothing more was required. This is particularly true here, where comparable evidence as to the existence and content of the record was presented to the jury through the uncontradicted testimony of a credible deputy sheriff. ██ In fact, in view of the defense's ability to present such comparable evidence, a question arises as to whether the missing record even met the test of constitutional

materiality described in *California* v. *Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413, 104 S.Ct. 2528].[34]

### 4. Final Argument

 The defendant argues that the prosecutor was guilty of prejudicial misconduct with respect to certain remarks made during closing argument regarding the assassination of President Kennedy, and a reference to a defense exhibit as a "clever trick." With respect to the first matter, the prosecutor told the jury that a "guilty verdict in this case will be a signal to the people in the entire country, and the entire world, that we do not, and will not tolerate assassinations in this country." Secondly, the prosecutor made a reference to a defense exhibit showing an automobile, *other than the defendant's,* which had the defendant's license plate (534 TER) on it. The defendant argues that the prosecutor was "suggesting" that the defense had fabricated evidence in offering that photograph.

 It is settled that a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. (*People* v. *Wein* (1958) 50 Cal.2d 383, 396 [326 P.2d 457]; *People* v. *Silva* (1953) 41 Cal.2d 778, 783 [264 P.2d 27]; *People* v. *Ross* (1960) 178 Cal.App.2d 801, 808 [3 Cal.Rptr. 170]; *People* v. *Coontz* (1953) 119 Cal.App.2d 276, 282 [259 P.2d 694].) It is also clear that counsel during a summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature. (*People* v. *Thornton* (1974) 11 Cal.3d 738, 762 [114 Cal.Rptr. 467, 523 P.2d 267]; *People* v. *West* (1983) 139 Cal.App.3d 606, 611 [189 Cal.Rptr. 36].) The prosecutor is entitled to draw conclusions from the evidence presented and to state them to the jury. The right is very broad and includes the opportunity to fully state his views as to what the evidence shows and as to the conclusions to be drawn therefrom. (*People* v. *Eggers* (1947) 30 Cal.2d 676, 693 [185 P.2d 1]; *People* v. *Beivelman* (1968) 70 Cal.2d 60, 76-77 [73 Cal.Rptr. 521, 447 P.2d 913].)

 Moreover, even in a case where prosecutorial misconduct is shown, reversal will not result ". . . unless the misconduct can be said to have contributed materially to the verdict in a closely balanced case or is of such

---

[34]To meet the requirement of constitutional materiality, the United States Supreme Court in *Trombetta* stated (467 U.S. 479, 489 [81 L.Ed.2d 413, 422) that the "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (See also *People* v. *Tierce* (1985) 165 Cal.App.3d 256, 263 [211 Cal.Rptr. 325].)

a nature that it could not have been cured by a proper and timely admonition." (*People* v. *McDaniel* (1976) 16 Cal.3d 156, 176 [127 Cal.Rptr. 467, 545 P.2d 843].) As an examination of the evidence will show, there was nothing "close" about this case and defendant did not even object to, or seek an admonition regarding, the prosecution's argument.

The misconduct complained of here, is the kind of matter (even assuming it was improper) to which objection should have been asserted at the time that it occurred. It should not be raised upon appeal unless there is a showing (1) that the appellant did object to the alleged misconduct, (2) that he assigned the objectionable conduct as misconduct, and (3) that he requested a corrective instruction or admonition. (*People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468]; *People* v. *Wong* (1973) 35 Cal.App.3d 812, 833 [111 Cal.Rptr. 314].) It is settled that the ". . . trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of the jury. . . . [T]he initial question to be decided in all cases in which a defendant complains of prosecutorial misconduct for the first time on appeal is whether a timely objection and admonition would have cured the harm. If it would, the contention must be rejected [citation]; if it would not, the court must then and only then reach the issue whether on the whole record the harm resulted in a miscarriage of justice within the meaning of the Constitution [citations]." (*People* v. *Green, supra,* 27 Cal.3d 1, 27, 34.)

The statements of the prosecution here seem no more objectionable than those found to be proper in *People* v. *Goldberg* (1984) 161 Cal.App.3d 170, 189-191 [207 Cal.Rptr. 431] and *People* v. *Meneley* (1972) 29 Cal.App.3d 41, 58-62 [105 Cal.Rptr. 432]. To the extent that they were improper a timely objection and admonition would have cured any harm. As already noted, there was no objection nor any corrective instructions asked for or given. Therefore, defendant's argument must be rejected.

## B. *Claimed Jury Misconduct*

The jury returned its verdict in the guilt phase of the trial on January 4, 1984. At that time it also found as true the alleged special circumstance relating to the national origin of the victim. (Pen. Code, § 190.2, subd. (a)(16).) One week later, on January 11, 1984, during the penalty phase trial, the court received a note from one of jurors (Juror No. 7, Dylane Rankins). The note, in essence, communicated two thoughts. First, that Juror Rankins wanted to change her vote on the special circumstance charge and, second, that some improper matter was considered by the jury before it reached its verdict.

After reviewing the note with counsel, the court conducted an inquiry which involved a separate in-chambers interrogation of *each* of the 12 jurors. This interrogation related solely to the matters allegedly received by the jury which had *not* been admitted into evidence.[35] According to Juror Rankins, one of the jurors had made a reference during deliberations, to a "call made to the Turkish Consulate."

Juror Rankins went on to indicate that it was this information which caused her to change her mind and vote with the other jurors that the allegation regarding the national origin special circumstance was true. However, she conceded that the subject of the telephone call was brought up only once and that there was no discussion about it.[36]

The examination of the other eleven jurors established that eight of them had no recollection of any mention of a phone call during deliberations. Of the remaining jurors, other than the Juror Rankins, one (Juror Walker) stated that he had a "vague recollection" that a phone call had been mentioned, but he insisted that the jury as a whole did not discuss it. Furthermore, he was not even sure at what time or point in the deliberations it had come up. Another (Juror Kennelly), seemed to recall something about a telephone call for publicity which had been mentioned during the trial. However, on examination by the defendant's counsel, she emphasized that all of the jurors were "pretty thoughtful to stop it right away if there was anything that we couldn't talk about."

Finally, the jury foreman (Juror Castillo) at first had no recollection of there being any discussion about a phone call to the Turkish Embassy. After a lunch break, however, he told the court that he did recall that someone had mentioned such a phone call, but he could not remember at what point and time it occurred. But he then emphasized to the court that it was something the jurors agreed they could not consider.[37] In other words, the jury clearly followed the court's instructions which required them to decide the case *solely* on the evidence presented.

---

[35]No contention is made here that Juror Rankins had any right to change her vote or that the trial court should have recognized or permitted her attempt to repudiate her agreement to the verdict of January 4, 1984. (See *People* v. *Peavey* (1981) 126 Cal.App.3d 44, 48-49 [178 Cal.Rptr. 520].)

[36]See footnote 25, *ante.*

[37]In his testimony the jury foreman stated: "And that was brought in some how like that and we felt that since it wasn't mentioned in court, it was something that we couldn't deliberate on."

Later, in describing the deliberations, he testified: ". . . the way it was mentioned—like I said, we were talking about it. Everybody was putting in their two cents at one time. Somebody mentioned it and that is how—everybody started to get into it like that. We said we couldn't talk about that because it wasn't brought up in court. But that is how the whole thing started about the telephone call now that I remember."

 The People concede that the reference to such a phone call introduced into the deliberations a matter which was not admitted into evidence and as such constituted jury misconduct. (*People* v. *Martinez* (1978) 82 Cal.App.3d 1, 21 [147 Cal.Rptr. 208].) The jury's receipt of evidence which has not been admitted is error which, although not prejudicial per se (*People* v. *Sutter* (1982) 134 Cal.App.3d 806, 820 [184 Cal.Rptr. 829]), does create a presumption of prejudice to the defendant. (*People* v. *Boyd* (1979) 95 Cal.App.3d 577, 586 [157 Cal.Rptr. 293].) This presumption of prejudice may be rebutted only by "proof that no prejudice actually resulted." (*People* v. *Honeycutt* (1977) 20 Cal.3d 150, 156 [141 Cal.Rptr. 698, 570 P.2d 1050]; *People* v. *Hogan* (1982) 31 Cal.3d 815, 846 [183 Cal.Rptr. 817, 647 P.2d 93].) Under such circumstances it is settled that unless the presumption of prejudice is rebutted, the accused is entitled to a new trial, *regardless* of the probability that a more favorable verdict would or would not have resulted absent the error. (*People* v. *Pierce* (1979) 24 Cal.3d 199, 206-207 [155 Cal.Rptr. 657, 595 P.2d 91]; *People* v. *Diaz* (1984) 152 Cal.App.3d 926, 935 [200 Cal.Rptr. 77].)

The presumption of prejudice "may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct." (*Hassan* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 417 [185 Cal.Rptr. 654, 650 P.2d 1171].) The Supreme Court in *Hassan* noted that some of the factors which are to be considered in determining whether the presumption has been rebutted include ". . . the strength of the evidence that misconduct occurred, the nature and seriousness of the misconduct and the probability that actual prejudice may have ensued." (*Hassan* v. *Ford Motor Co., supra,* 32 Cal.3d at p. 417; *People* v. *Diaz* (1984) 152 Cal.App.3d 926, 935 [200 Cal.Rptr. 77].)

 The question thus presented is whether or not the evidence developed from the court's interrogation of the 12 jurors, when examined in light of the entire record, rebuts the presumption that a new trial is necessary. It is apparent from the testimony of the jurors that while some reference to a phone call may have been made by one of the jurors, it was not a part of the jury's deliberations and was not discussed by them. In fact, several jurors went out of their way to point out that whenever any extraneous matters came up the jurors conscientiously followed the court's instructions and agreed that they could not consider anything which had not been received into evidence. These were objective expressions by the jurors themselves as to which there is no dispute.

Under such circumstances, it is clear that the jury's impartiality was not affected, the prosecution's burden was not lightened and no asserted defense

was contradicted. (*People* v. *Martinez, supra,* 82 Cal.App.3d 1, 22; *People* v. *Sutter, supra,* 134 Cal.App.3d 806, 820.) We therefore conclude that any presumed prejudice has been rebutted by the statements of the jurors themselves. No prejudice actually resulted, because the extraneous matter was not a part of the jury's deliberations. (*People* v. *Hill* (1980) 110 Cal.App.3d 937, 942-943 [168 Cal.Rptr. 272].)

The testimony of Juror Rankins cannot, as the defendant urges, justify a contrary result. Her statements regarding the "effect" of this extraneous evidence upon her decision as to how she would vote, is plainly inadmissible under the provisions of Evidence Code section 1150, subdivision (a).[38] (*In re Stankewitz* (1985) 40 Cal.3d 391, 397 [220 Cal.Rptr. 382, 708 P.2d 1260]; *People* v. *Ryner* (1985) 164 Cal.App.3d 1075, 1082-1083 [211 Cal.Rptr. 140]; *People* v. *Sutter, supra,* 134 Cal.App.3d 806, 819-821; *People* v. *Peavey, supra,* 126 Cal.App.3d 44, 50-51.)

### C. *Claimed Errors in the Admission of Evidence*

During the trial the defendant objected to the introduction of a map and other written material (designated as People's exhibit 50), on the grounds that it had not been properly authenticated and contained hearsay matter. In addition, there was an objection to several photographs picturing the defendant in fatigues and holding guns. (People's exhibits 39, 40, 41 and 42.) These photographs had been obtained from the defendant's home pursuant to a search warrant. The defendant argued that they were irrelevant to any contested issue in the case, and whatever probative value they might have was far outweighed by their prejudicial effect.

Prosecution witness Busch testified that he prepared exhibit 50 some time after his jailhouse conversation with the defendant. He characterized the writing as a "semimap" of the area where the killing took place. He was extensively cross-examined by defendant's counsel regarding the contents of this document. During such cross-examination, the defendant's counsel elicited from Busch extensive testimony about all of the matters contained in that writing, including the written notations made by Busch based on his conversation with a person *other* than the defendant. However, no objection was asserted to the writing or its contents until the People offered it in

---

[38]Evidence Code section 1150, subdivision (a) provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

evidence.[39] The court in overruling the objection acknowledged that both counsel had gone into extensive amounts of hearsay in their examination of the witness Busch and, in the court's judgment, it was entirely appropriate to permit the jury to actually see the exhibit.[40]

The People also introduced exhibits 39, 40, 41 and 42, the blown-up copies of four snapshots seized in a search of the defendant's home. As already noted, these photographs depicted the defendant dressed in fatigues and holding different weapons. One of them pictured the defendant holding an assault rifle, while the other showed him holding two handguns. One of the pictures showed the defendant holding a handgun with both hands, with his knees bent in a type of stance similar to that which the witness Kaufhold said was adopted by the shooter on the passenger side of Arikan's vehicle. The prosecutor argued that these photographs resembled weapons that the defendant used in this particular case (although there was no contention that they were the same weapons), and also that the defendant obviously had in his possession various weapons and appeared to know how to use them. That is, that he had the knowledge and the means to commit the crime. (Evid. Code, § 1101, subd. (b); *People* v. *Archerd* (1970) 3 Cal.3d 615, 638 [91 Cal.Rptr. 397, 477 P.2d 421].)

A further ground for their admission was that they corroborated testimony of the witness Busch. Although the trial court appeared to be unhappy with this conclusion, this was the primary basis upon which these photographs were admitted.[41]

---

[39]Had defendant's counsel desired to preserve his hearsay objection to exhibit 50, he should have refrained from an examination of the witness which placed before the jury all of the information to which he later wanted to object. The prosecutor did not develop this information, the defendant did. The hearsay objection came too late. (*People* ex rel. *Department of Public Works* v. *Alexander* (1963) 212 Cal.App.2d 84, 97 [27 Cal.Rptr. 720]; *In re Plummer* (1947) 79 Cal.App.2d 651, 655 [180 P.2d 771].)

[40]Specifically, the court noted: "Both of you have gone very minutely into an awful lot of hearsay as to what was told various people by other people on different occasions, so I think by now what ever foundation is required for the admission of that additional material upon that [*i.e.*, exh. 50], it has been established.

"And I will also find that it is not so prejudicial as to outweigh its value one way or the other for the jury. . . .

"50 is admitted as is, with all of its pristine loveliness."

[41]The court stated: "The point here is whatever the worth of that foundational evidence is for the jury to decide; and having that foundation, that means that these photographs become relevant.

"If the foundation is valueless, theoretically the rest of it should be valueless.

"We know, however, that that rule is honored in the breach as many of the rest of these rules that supposedly are applicable in such circumstances such as telling the jury to disregard something that they have already heard, or not to consider something if the foundation is bad.

"So although it sickens me, and personally I am affronted by this, to admit what is apparent to me manipulation of this it seems the rules are—I don't have to like it, I do not

 A trial court is vested with wide discretion in deciding the relevancy of evidence. (*People* v. *Green, supra*, 27 Cal.3d 1, 19; *People* v. *Yu* (1983) 143 Cal.App.3d 358, 376 [191 Cal.Rptr. 859].) Further, it is the exclusive province of the trial court to determine whether the probative value of evidence outweighs its possible prejudicial effect. (*People* v. *Demond* (1976) 59 Cal.App.3d 574, 586 [130 Cal.Rptr. 590].) On appeal, the court's exercise of such discretion will not be disturbed absent a clear showing of abuse. (*People* v. *Delgado* (1973) 32 Cal.App.3d 242, 251 [108 Cal.Rptr. 399]; *People* v. *Kelley* (1977) 75 Cal.App.3d 672, 678 [142 Cal.Rptr. 457].)

 Based upon this record it cannot be said that the court has abused its discretion in admitting these exhibits into evidence. They each have probative value relating to and depending upon the testimony of the witness Busch. His testimony provided the primary evidence offered by the People on the special circumstance relating to national origin. That testimony having been received, and in the face of substantial attacks by the defendant that such evidence was inherently incredible, any evidence which tended to provide corroboration had a great deal of relevance. That being so, the greater must be the showing of prejudice to the defendant. (*Kessler* v. *Gray* (1978) 77 Cal.App.3d 284, 291 [143 Cal.Rptr. 496].) No such showing has been made here. We find no abuse of the trial court's discretion.

### D. *Claimed Instructional Errors*

The defendant argues that the trial court made three instructional errors. First, he claims the court gave an improper aiding and abetting instruction which permitted the jury to convict him on the special circumstance of "national origin" even though that may not have been *his* motive, but rather the motive of the unnamed defendant he was "aiding" or "abetting." The defendant claims that the instructions as given, did not require the jury to agree unanimously on the act which resulted in his conviction. That is, whether the defendant was the killer, or whether he was an aider or abettor of the killer. Secondly, the defendant claims that the court improperly submitted a lying-in-wait instruction to the jury. Finally, he claims that the court failed to give an instruction requested by the defense on circumstantial evidence. (CALJIC No. 2.01.)

---

like it and I won't like it.

"But apparently these items are going to be brought into evidence because they tend to corroborate Mr. Busch's testimony, and so they are relevant and so they are admissible.

"And the probative value of his corroboration outweighs the prejudicial effect in my view, and thus justice weeps still."

### 1. The Aiding and Abetting Instruction

 The court gave, as part of its instructions, an introductory instruction on special circumstances CALJIC No. 8.80. Included on that printed instruction were alternative instructions relating to aiding and abetting and multiple defendants. Neither of these alternative instructions was applicable to the facts of this case. Nonetheless, the trial court deleted only the portion of the alternative instructions relating to multiple defendants, and gave to the jury, in both written and oral form, the instruction on aiding and abetting.[42]

However, in the colloquy with counsel which took place regarding the proposed jury instructions, the trial court and counsel all had recognized the inapplicability of such an aiding and abetting instruction.[43]

The record reflects that this instruction may well have caused some confusion in the mind of the jury. Just prior to the time that it returned with its verdict the jury sent out a question relating to the significance of a finding that the defendant was "not the actual killer with the gun."[44]

The court indicated to the jury that it was not sure what was meant by the question and sent the jury back to clarify it. Within two hours thereafter, and without submitting any further questions, the jury returned its verdict of guilty on the charge of murder in the first degree and a true finding on the special circumstance relating to nationality and country of origin. The jury did *not* reach a verdict on either the special circumstance of "lying-in-wait" or the gun use charge (Pen. Code, § 12022.5).[45]

---

[42]The alternative instruction which was not deleted provided: "If the defendant Harry Sassounian was not the actual killer, it must be proved beyond a reasonable doubt that he intentionally aided, abetted, counseled, commanded, induced, solicited, requested or assisted the actual killer in the commission of the murder of the first degree before you are permitted to find the alleged special circumstance of that first degree to be true as to the defendant."

[43]"THE COURT: Now, what about—any others? We have 8.80, special circumstances.

"MR. GERAGOS: I don't recall having any objection to that one by itself.

"THE COURT: *There may be some strikeouts. We're not talking about aiding and abetting here, are we?*

"MR. GERAGOS: No.

"THE COURT: So you are going to leave that out, aren't you?

"MS. RUBIN: Yes.

"THE COURT: You might want to look at that and see whether or not there are any strikeouts you want." (Italics supplied.)

[44]See footnote 22, *ante.*

[45]See footnotes 23 and 24, *ante.*

██ ██ The defendant argues that the aiding and abetting instruction given by the court was incomplete and prejudicial.[46] He further states that if he is to be convicted as an aider and abettor (which he now contends is the only basis for the jury's verdict) then he was entitled to *sua sponte* instructions on aiding and abetting, provided for in CALJIC Nos. 3.00 and 3.01 (as modified, of course, to correct the *"Beeman* error"—see below). He argues that under the instructions as given, the jury was permitted to reach a true finding on the nationality special circumstance if (1) the defendant intentionally aided the actual killer in the commission of the murder, and (2) the actual killer killed for purposes of national origin or nationality. The defendant contends that the instructions did not require, as they should have, that *he* be shown to have shared both the intent and motive required of the killer (that is that the killing be intentional and motivated by the victim's national origin). If any theory of the prosecution's case was based upon aiding and abetting, then this contention would have merit. In *People* v. *Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318], the Supreme Court held that it was necessary for an aider and abettor to share the criminal intent of the perpetrator. *Beeman* has retrospective application. (*People* v. *Croy* (1985) 41 Cal.3d 1, 12 [221 Cal.Rptr. 592, 710 P.2d 392]; *People* v. *Tovar* (1984) 161 Cal.App.3d 137, 142-143 [207 Cal.Rptr. 255].)

However, the record herein reflects that the defendant was not tried as an aider and abettor, but as one of the direct and active participants in this crime. All of the evidence presented by the People demonstrated that the killing of Arikan resulted from the actions of two gunmen, who waited for him to appear on the morning of January 28, 1982, and when he stopped his vehicle at the intersection of Wilshire and Comstock, emptied their pistols into his body. Eyewitnesses identified the defendant as one of these gunman. The defendant was not tried as an aider and abettor, there was no evidence to support such a theory and neither side argued that theory to the jury.

As the People point out, the defendant's counsel told the jury that the only issue presented to them for decision was whether or not the defendant

---

[46]The defendant argues that prejudice is demonstrated, at least in substantial part, by the jury's failure to find true the gun use charge. However, to accept that argument would require this court to engage in an impermissible degree of speculation as to the jury's deliberative process. The failure of the jury to agree on this charge may not serve as a basis for an attack on a conviction for murder, even where the undisputed evidence demonstrates that the victim was killed with a gun. A gun use allegation is not an element of the crime of murder, nor, indeed, even a separate offense. It is nothing more than a penalty increasing enhancement (which the prosecutor may or may not choose to charge). (*People* v. *Read* (1983) 142 Cal.App.3d 900, 903-906 [191 Cal.Rptr. 305]; *People* v. *Henderson* (1972) 26 Cal.App.3d 232, 237, fn. 4 [102 Cal.Rptr. 670].) The failure of the jury to agree on the truth of such a penalty enhancement allegation may not be used to impeach the verdict of guilty on the murder charge.

was one of the two gunman identified by the witnesses as the persons who committed the crime.[47] No argument was raised by the defendant that the killing was not intentional, or that the defendant's participation was solely that of an aider or abettor. The defense asserted by the defendant, was that of *alibi and mistaken identification*. Given that state of the record, we concur with the People that the sole basis for the defendant's conviction was that he was the actual perpetrator of the offense, and that "under no reasonable hypothesis" could the jury have been misled into convicting on an aiding and abetting theory. (*People* v. *Leach* (1985) 41 Cal.3d 92, 105-106 [221 Cal.Rptr. 826, 710 P.2d 893]; *People* v. *Marks* (1985) 167 Cal.App.3d 103, 107-108 [212 Cal.Rptr. 894].)

Moreover, it seems clear that the question of the defendant's intent was the subject of adequate instructions, which were properly given, and, in view of the evidence presented, when considered in its entirety, it is clear that the jury found that the defendant did have the specific intent to kill his victim because of his national origin. For this reason any instructional error that may have occurred here (and it would appear that the inadvertence of the court, in including the alternative paragraph in CALJIC No. 8.80, regarding aiding and abetting, was error) was harmless under the *Sedeno* and *Cantrell-Thornton* exceptions discussed by the court in *People* v. *Garcia* (1984) 36 Cal.3d 539, 554-557 [205 Cal.Rptr. 265, 684 P.2d 826].[48] The

---

[47]Defendant's counsel opened his argument to the jury with the following: "There is only one real question of fact in this case, very simple, straightforward, clean-cut issue. It's not whether Mrs. Arikan is a widow with two children. It's not whether the genocide occurred or didn't occur, or whether there is revenge or anything of that sort.

"*There is only one issue in this case, an issue of fact.*

"There is really one basic thing that you have to decide as jurors in this case. It's so simple it begs for a simple answer, and that is simply this. Is the man on the southeast corner of Wilshire and Comstock on that morning of January 28, 1982 Harry Sassounian or not, because if it's not then all the rest of this stuff is meaningless.

"I'm not here to apologize for this conduct. This is terrible conduct, shooting someone on the streets of Los Angeles.

"We're not talking about that. There is no issue there. *Mr. Arikan was shot to death by two persons, or assassins on the streets of Los Angeles.* You don't have to make any big weighty decisions concerning that. That's a given.

"*What the real issue in this case, as I said to you in my opening statement, the real issue in this case is can the prosecutor prove that my client Harry Sassounian did the act.*" (Italics supplied.)

[48]The court in *Garcia* quoted with approval the following language from *People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913] (*Sedeno* exception): "'. . . in some circumstances it is possible to determine that although an instruction . . . was erroneously omitted, the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, and there can be no prejudice to the defendant . . . .' We believe that, in an appropriate case, the United States Supreme Court would accept this exception to the automatic reversal standard."

The *Garcia* court also noted (at p. 556) that a meaningless retrial might be avoided by

instruction did not have the effect of taking the issue of defendant's intent away from the jury.

It seems clear to us from an examination of this record that the parties recognized that intent had to be proven (i.e., it was an element of *both* alleged special circumstances) and therefore defendant had every incentive to place before the jury any evidence he had on that issue. Certainly, there is no contention made that all of the evidence available on the issue was not offered. Clearly, there was no contrary evidence worthy of the jury's consideration. This is not surprising since the character of the defenses which were asserted (alibi and mistaken identity) effectively precluded defendant from a credible contest on the issue of intent.[49]

Thus, we conclude that the potential for confusion created by the erroneous aiding and abetting instruction was negated by other properly given instructions[50] and the overwhelming evidence of the guilt and intent of the defendant. The People's burden of proving the defendant's intent was *not* lessened and the issue was *not* taken from the jury by the erroneous reading of the alternative paragraph regarding aiding and abetting. (*People* v. *Sedeno*, *supra,* 10 Cal.3d at p. 721.) If the jury had remained troubled by this issue, further questions could have been addressed to the court. There were none.

## 2. The Lying-in-wait Instruction

 The defendant's next contention is that the trial court erred in giving a lying-in-wait instruction, CALJIC 8.25. This need not detain us long. The defendant argues that since there was no evidence of "concealment" it was inappropriate to give this instruction. There are two answers to that contention. The first is that concealment, in the sense that the defendant uses

permitting an exception to the per se reversal rule in those ". . . cases where the parties recognized that intent to kill was in issue, presented all evidence at their command on that issue, and in which the record not only establishes the necessary intent as a matter of law but shows the contrary evidence not worthy of consideration." (*Cantrell-Thornton* exception; see *People* v. *Cantrell* (1973) 8 Cal.3d 672, 685 [105 Cal.Rptr. 792, 504 P.2d 1256] and *People* v. *Thornton* (1974) 11 Cal.3d 738, 768-769, fn. 20 [114 Cal.Rptr. 467, 523 P.2d 267].) In an accompanying footnote the court cited as an example of such a case, a first degree murder which did not rely on the felony-murder rule (Pen. Code, § 190.2, subd. (a)(17)) but rather on some special circumstance "which expressly requires an intent to kill." The special circumstances here involved, and on which the jury was instructed, each have such a requirement (Pen. Code, § 190.2, subds. (a)(15) and (16)).

[49]However, we do *not,* because it is unnecessary to do so, rest our conclusion on the proposition that the assertion of an alibi defense amounts to a concession of the issue of intent.

[50]For example, under the instructions given regarding murder (CALJIC Nos. 3.31 and 2.02) and the special circumstance relating to nationality or country of origin (CALJIC No. 8.81.16), the jury was required to find that the defendant had the intent to kill Arikan.

the term, is not required in order to justify and support a "lying-in-wait" special circumstance. The concealment which is required, is that which puts the defendant in a position of advantage, from which the factfinder can infer that lying-in-wait was part of the defendant's plan to take the victim by surprise. (*People* v. *Ward* (1972) 27 Cal.App.3d 218, 230-231 [103 Cal.Rptr. 671].) It is sufficient that a defendant's true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim. (*People* v. *Tuthill* (1947) 31 Cal.2d 92, 100-101 [187 P.2d 16]; *People* v. *Hyde* (1985) 166 Cal.App.3d 463, 475-476 [212 Cal.Rptr. 440].)[51] The second answer to the defendant's contention lies in the fact that the jury failed to reach any verdict as to this alleged special circumstance, and a mistrial (as to that charge) was declared. Subsequently, the allegation was dismissed in the interest of justice upon the People's motion. (Pen. Code, § 1385.) Thus, the defendant suffered no prejudice and whatever error there was in giving this instruction was truly harmless.

### 3. The Failure to Give Instruction on Circumstantial Evidence

 Finally, the defendant contends that the court erroneously refused to give the CALJIC instruction No. 2.01, on circumstantial evidence. The trial court's reason for such refusal was its conclusion that this was not a circumstantial case.[52] It is entirely appropriate for the trial court to make the determination as to whether the evidence against the defendant was direct or circumstantial. (*People* v. *Castellano* (1978) 79 Cal.App.3d 844, 859 [145 Cal.Rptr. 264].) This instruction is not required when the defendant is identified through the testimony of eyewitnesses, and the prosecution's case is based substantially or primarily on direct evidence. (*People* v. *Butler* (1980) 104 Cal.App.3d 868, 877-878 [162 Cal.Rptr. 913]; *People* v. *Flores* (1981) 115 Cal.App.3d 67, 84 [171 Cal.Rptr. 365].)

The evidence presented by the prosecution included at least three eyewitnesses who placed the defendant at the scene of the killing, standing on the passenger side of the victim's car at the time of the shooting, and fleeing the scene with the man who was identified as the shooter on the other side of the car. The witnesses also established that both men were armed with handguns, and used a vehicle registered to the defendant to complete their getaway. This evidence certainly justified the trial court's conclusion that

---

[51]The evidence presented in this record certainly was sufficient to satisfy the requirement of "watchful waiting" emphasized in *Richards* v. *Superior Court* (1983) 146 Cal.App.3d 306, 315 [194 Cal.Rptr. 120].

[52]The trial judge stated: "I think the case is not substantially or entirely based upon circumstantial evidence, and I think it is one of those cases where it [*i.e.*, CALJIC No. 2.01] should not be given. I will not give it."

the People's case was primarily based upon direct, rather than circumstantial, evidence.

E. *The Defendant's Claims With Respect to the Special Circumstance Relating to Nationality or Country of Origin (Pen. Code, § 190.2, subd. (a)(16))*

The defendant cites four grounds of objection to the special circumstance finding and the sentence imposed thereon.

### 1. Sufficiency of the Evidence

■■■ The defendant first argues that there was insufficient evidence introduced to support the jury's conclusion that Arikan's murderer was motivated by his nationality or country of origin.[53] The evidence upon which the People primarily relied during the trial to establish that special circumstance came from the testimony of the witness Busch. As already discussed, Busch claimed to have had a conversation with the defendant at which time the defendant described to him the circumstances and planning of, and the motivation for, the killing of Arikan.

The defendant argues in his brief, the evidence on this special circumstance was "based upon the confession [obtained by Busch] and nothing else but the confession." This is essentially true, although, as already noted, corroborative evidence was also presented. However, the defendant urges that the testimony of Busch was so inherently incredible as to prevent any reasonable trier of fact from finding that the existence of the special circumstance was true beyond a reasonable doubt.

■■■ What this argument overlooks is that it is beyond the province of this court to reweigh the evidence. (*People* v. *Vann* (1974) 12 Cal.3d 220, 225 [115 Cal.Rptr. 352, 524 P.2d 824]; *People* v. *Culver* (1973) 10 Cal.3d 542, 548 [111 Cal.Rptr. 183, 516 P.2d 887].) The test on appeal is "not whether the evidence proves guilt beyond a reasonable doubt, but whether there is substantial evidence to support the conclusion of the trier of fact." (*People* v. *Villagren* (1980) 106 Cal.App.3d 720, 728 [165 Cal.Rptr. 470].) So long as the circumstances reasonably justify the finding, reversal is not warranted simply because the evidence might support a contrary conclusion. (*People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].) As one court emphasized: " ' "*Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of the judgment,*

---

[53]This appears to be an exception to the defendant's initial disclaimer regarding any contention that the evidence was not sufficient to support the verdict. (See fn. 26, *ante*.)

*for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends."'"* (*People* v. *Ontiveros* (1975) 46 Cal.App.3d 110, 117 [120 Cal.Rptr. 28]; see also *People* v. *Thornton* (1974) 11 Cal.3d 738, 754 [114 Cal.Rptr. 467, 523 P.2d 267]; *People* v. *Mayberry* (1975) 15 Cal.3d 143, 150 [125 Cal.Rptr. 745, 542 P.2d 1337].)

 More to the point, with respect to defendant's argument, regarding the "incredibility" of Busch's testimony, it is settled that, "'"'[A]lthough an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category. [Citation.] To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.]"'"'" (*People* v. *Mayberry, supra,* 15 Cal.3d at p. 150.)

Both the People and the defendant argue at length the conflicting evidence relevant to the credibility of the witness Busch and the confession which he testified the defendant made to him while both were in the Los Angeles County jail. No purpose will be served by any further exposition of this evidence. It is sufficient to note that on this record we cannot conclude that the matters to which Busch testified were either physically impossible or demonstrably false without resort to inferences or deductions. As the trial court correctly noted, it was up to the jury to decide whether Busch was credible or not. The jury reached its decision and found the special circumstance to be true. That finding is binding on this court.

2. Corpus Delicti Instruction

 The defendant next argues that the trial court failed to instruct the jury on the requirement that a corpus delicti must be shown with respect to the existence of a special circumstance. In making this argument, the defendant relies upon the recently adopted proposition that with respect to a special circumstance *based upon the commission of a separate felony* (e.g., robbery or rape), the law requires evidence, *independent of a confession,* to establish a corpus delicti of that other crime in order to justify the finding of the existence of a special circumstance involving such other crime. (*People* v. *Mattson* (1984) 37 Cal.3d 85, 93-94 [207 Cal.Rptr. 278, 688 P.2d 887].)

The defendant argues that "no principled reason in a system which requires due process of law [exists] why the rule would not also apply to non-felony

based specials, such as the 'national origin' special circumstance in this case.'' However, the authorities upon which the defendant relies all involved *felony based* special circumstances. (E.g., *People* v. *Mattson* (1984), *supra,* 37 Cal.3d 85 [involving the separate crimes of rape and kidnapping]; *People* v. *Alcala* (1984) 36 Cal.3d 604, 625 [205 Cal.Rptr. 775, 685 P.2d 1126], [involving the separate crime of rape]; *People* v. *Garcia* (1984) 36 Cal.3d 539, 552 [205 Cal.Rptr. 265, 684 P.2d 826], [involving the separate crime of robbery].)

▮▮▮ As the court in *Mattson* noted, the rule which it adopted was required in order to avoid the anomalous result which would occur if a *felony based* special circumstance could support a felony murder conviction without independent evidence, yet the corpus rule would apply when the same felony was charged as a separate substantive crime. (37 Cal.3d at p. 94.) This result is also mandated by Penal Code section 190.4, subdivision (a).[54]

▮▮▮ The defendant cites us to no authority which requires this rule to be applied in a *nonfelony* based special circumstance. The People argue that the rule requiring such evidence of an underlying felony should only be applicable where the special circumstance is based on the commission of *another* crime. We agree.

In the case of *nonfelony based* special circumstances, such as the one involved here, (i.e., "nationality or country of origin"), there is no *other crime* which must be established. Rather, we are concerned with the status of the victim and the motive of the defendant. Thus, there is no crime to be proven and the rationale for requiring proof of a corpus, independent of

---

[54]Section 190.4, subdivision (a), provides in pertinent part: "Whenever special circumstances as enumerated in Section 190.2 are alleged and the trier of fact finds the defendant guilty of first degree murder, the trier of fact shall also make a special finding on the truth of each alleged special circumstance. The determination of the truth of any or all of the special circumstances shall be made by the trier of fact on the evidence presented at the trial or at the hearing held pursuant to Subdivision (b) of Section 190.1.

"In case of a reasonable doubt as to whether a special circumstance is true, the defendant is entitled to a finding that it is not true. The trier of fact shall make a special finding that each special circumstance charged is either true or not true. *Whenever a special circumstance requires proof of the commission or attempted commission of a crime, such crime shall be charged and proved pursuant to the general law applying to the trial and conviction of the crime. . . .*" (Italics supplied.)

Under *People* v. *Cantrell* (1973) 8 Cal.3d 672, 680-681 [105 Cal.Rptr. 792, 504 P.2d 1256], there is no requirement that the corpus delicti of the underlying felony be shown in a case where the defendant is charged with murder on a felony-murder theory. In *Mattson,* the court refused to apply that rule in the case of *felony based* special circumstances. It concluded that the language in section 190.4, subdivision (a), quoted above, required that the corpus delicti of the *underlying crime* be established in accordance with such "general law."

a confession, simply does not exist. Moreover, it is clear that on its face section 190.4, subdivision (a), has no application whatever to a *nonfelony* based special circumstance.

Even if some further evidence of the defendant's motive beyond the confession were required, it is clear that such evidence need only be slight and can be established by circumstantial evidence and reasonable inferences to be drawn therefrom. (*People* v. *Cantrell, supra,* 8 Cal.3d 672, 679.) Such additional evidence is clearly present here. It was proved that Arikan was a Turkish national, and a representative of the Turkish Government. He was that country's consul general in the United States and as such, officially represented the Government of Turkey in the United States. The defendant is an Armenian, and was characterized by his own brother as having a great dislike for the Turkish Government and the Turkish people for what they did to the Armenian people in 1915. Moreover, the evidence clearly supports the inference that Arikan and his vehicle were not selected at random by the two gunmen. They apparently had been waiting for him. His car was conspicuously identified by "Consul Corps" license plates, and when he arrived at the intersection where the gunmen were waiting, the attack was direct, sudden, brutal and effective. From such facts a jury could reasonably draw the inference that Arikan was killed for no other reason than for his nationality and official position with the Turkish Government. No other crime, such as robbery or kidnapping, was even attempted.

3. Vagueness of the Special Circumstance

The defendant also attacks the special circumstance finding on the ground that the terms "nationality" and or "country of origin" are unconstitutionally vague. The defendant relies primarily upon the recent decision of the California Supreme Court in *People* v. *Superior Court (Engert)* (1982) 31 Cal.3d 797, 801-803 [183 Cal.Rptr. 800, 647 P.2d 76], where Penal Code section 190.2, subdivision (a)(14) (which describes as a special circumstance, a murder committed under circumstances which were "heinous, atrocious and cruel"), was held to be constitutionally defective because it was vague and uncertain. The defendant argues that the same conclusion is required here because the terms "nationality" and "country of origin" are similarly vague.

It cannot be doubted that due process requires that any penal statute clearly define and describe what is forbidden or prohibited. No person can be held criminally responsible for conduct which he could not understand to be proscribed. (*People* v. *Smith* (1984) 35 Cal.3d 798, 809 [201 Cal.Rptr. 311, 678 P.2d 886].) "Due process requires a statute to be definite enough to provide (1) a standard of conduct for those whose activities are proscribed

and (2) a standard for police enforcement and for ascertainment of guilt." (*Burg* v. *Municipal Court* (1983) 35 Cal.3d 257, 269 [198 Cal.Rptr. 145, 673 P.2d 732].)

The first goal, designed to provide fair notice, requires that a violation be described with a "'"reasonable degree of certainty"'" . . . so that 'ordinary people can understand what conduct is prohibited.'" (*Burg* v. *Municipal Court, supra,* 35 Cal.3d 257, 270-271.) The second goal is achieved if reasonable certainty is provided. This is true even where persons of ordinary intelligence may differ with respect to the meaning of a statutory term. Such differences do not necessarily make the statutes void. (*County of Nevada* v. *MacMillen* (1974) 11 Cal.3d 662, 672-673 [114 Cal.Rptr. 345, 522 P.2d 1345].)

We reject the defendant's argument that the terms "nationality" or "country of origin" are not capable of ascertainable definition or common understanding. The trial court felt the matter could be handled by proper jury instructions.[55]

As in *Engert,* resort to a dictionary is appropriate with respect to such terms as nationality. Webster's Third New International Dictionary (1981) defines that term as follows: a. *"National quality or character"*; b. *"The fact or state of belonging to a nation; the status of being a national; a legal relationship between an individual and a nation"*; c. "The quality or state of being a nation." (Italics supplied.)

The People argue that these definitions, individually and collectively, provide an easily ascertainable standard of conduct or workable standard of guilt. We agree. "A statute must be definite enough to provide a standard of conduct for those whose activities are proscribed as well as a standard for the ascertainment of guilt by the courts called upon to apply it." (*People* v. *McCaughan* (1957) 49 Cal.2d 409, 414 [317 P.2d 974].) As the Supreme Court stated in *Engert* (at p. 801), "The generally accepted criterion is whether the terms of the challenged statute are 'so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.'"

---

[55]When this issue arose at trial, the judge stated: "The question of whether the idea of national origin is so vague and meaningless as to be incapable of definition, I don't believe that's an insurmountable hurdle. I think the jury instructions can be drafted that will define that term and what is meant by that term in the law for the jury to handle, and of course then the issue becomes whether or not that jury instruction was proper, which is as I said not a constitutional question."

The trial court afforded the defendant's counsel an opportunity to offer alternative jury instruction wording with respect to the special circumstance. However, no such alternative instruction or additional language was offered or proposed.

The special circumstance with which the defendant was charged, was that he intentionally killed Arikan, because of his nationality and country of origin, in that he "was a Turkish National, within the meaning of Penal Code section 190.2, subdivision (a)(16)." There is nothing so vague about those terms as would require men of "common intelligence" to have to guess at their meaning or be in disagreement about their application to the facts of this case.

 In "order to determine whether [a] statute is sufficiently certain to meet the constitutional requirements of due process of law" the court may look to the "'common understanding and practices'" and to "'any demonstrably established technical or common law meaning of the language in question.'" (*People* v. *Davenport* (1985) 41 Cal.3d 247, 266 [221 Cal.Rptr. 794, 710 P.2d 861]; *People* v. *Barksdale* (1972) 8 Cal.3d 320, 327 [105 Cal.Rptr. 1, 503 P.2d 257].) For example, the term "national origin" has been used without difficulty for over 30 years as an integral part of the antidiscrimination language of the Unruh Civil Rights Act (Civ. Code, § 51 et seq.). That act has been held to be valid and properly applied to prohibit discrimination in a real estate transaction against persons of "Mexican ancestry." (*Vargas* v. *Hampson* (1962) 57 Cal.2d 479, 481 [20 Cal.Rptr. 618, 370 P.2d 322].)

The defendant was directly charged with the intentional killing of Arikan, because of Arikan's Turkish nationality. The evidence offered by the People directly established that fact, most particularly by the circumstances of the killing and the confession which the defendant made. Such evidence was sufficient to support the jury's conclusion that the defendant's motive was the very thing expressly and clearly proscribed by section 190.2, subdivision (a)(16).

4. Court's Exercise of Discretion to Strike the Special Circumstance

 Finally, the defendant argues that the trial court improperly failed to exercise its discretion to rule upon his motion to strike the special circumstance at the time of sentencing. He argues that under *People* v. *Williams* (1981) 30 Cal.3d 470, 489 [179 Cal.Rptr. 443, 637 P.2d 1029], a trial court has the power to strike a special circumstance. While that may be true, the short answer is that the judge had no obligation to rule on the motion, since the defendant had no authority to make it. (Pen. Code, § 1385; *People* v. *Shaffer* (1960) 182 Cal.App.2d 39, 44 [5 Cal.Rptr. 844]; *People* v. *Sanders* (1983) 145 Cal.App.3d 218, 225 [193 Cal.Rptr. 331], [disapproved on other grounds in *People* v. *Mattson* (1984) 37 Cal.3d 85, 94, fn. 4 (207 Cal.Rptr. 278, 688 P.2d 887)].) However, defendant's argument fails for reasons more compelling than that technical one.

The defendant urges that the trial court's remarks at the time of sentencing[56] indicate that the court felt that it was without power to rule upon the motion to strike the special circumstance and that the court's failure to so rule was the result of such misapprehension of the law rather than an exercise of discretion which amounted to a denial. However, an examination of all of the remarks of the court at the time (which immediately followed the denial of the defendant's motion for a new trial and immediately preceded the imposition of sentence), make it clear that the court, implicitly, if not explicitly, refused to strike the special circumstance.

Moreover, and more importantly, there would be little point in a remand even if we were to conclude that the trial judge had failed to rule because of an erroneous perception of his authority. The record herein demonstrates overwhelmingly the defendant's guilt, and that the jury found that he killed intentionally. That finding was amply supported by the evidence. No reason for any further leniency than that already given to the defendant by the jury is justified, or would be justified *in furtherance of justice*.

Unlike *People* v. *Williams, supra,* 30 Cal.3d 470, the trial judge here did not express the powerless desire to strike the special circumstance. He simply expressed some sympathy and concern for the defendant.

In *People* v. *Sanders, supra,* 145 Cal.App.3d 218, the court had before it this identical issue. There, as here, the trial judge had made remarks sympathetic to the defendant at the time it sentenced him to life without possibility of parole (following a jury verdict finding the defendant guilty of first degree murder and finding true an allegation of a felony-based special circumstance). In concluding that a motion to strike the special circumstance would avail the defendant nothing, *and would be an abuse of discretion if granted,* the court used language directly applicable here (at pp. 225-226): "We do not read the trial court's gratuitous and clearly off hand remark as indicating that it was desirous of affording leniency to the defendant beyond that which had already been afforded when the jury did not impose the death penalty. . . .

---

[56]The relevant comments made by the trial judge just prior to imposing sentence (which he directed to the defendant) are as follows: "The trend now is to take away the quality of mercy from judges and to leave the judge nothing to do with the business of sentencing or as little as possible, so the jury verdict, the law has provided that the jury may choose two verdicts, death or life without possibility of parole, and in our country, traditionally the jury's verdict has been sacred. It is entitled to have great respect, great reverence.

"I talked to those people who judged you. Many talked to me with tears in their eyes and told me that if they could have found a way within their duty, they would have even exonerated you, but they couldn't find a way in their duty to do that; and if they could have found a way to impose a lesser penalty, they would have if the law had permitted that, and it is true that our rules are harsher, but they are not political. They are not subject to the whim of the prosecutor."

"It thus appears to us that a remand to the trial court for resentencing would be an idle act and that no different result would obtain.

"Our conclusion in that regard is bolstered by our belief that the striking of the special circumstances, on the face of this record, would in any event be an abuse of discretion.

■■■ "Penal Code section 1385, while endowing the trial court with broad discretion, does not grant absolute discretion. The requirement of the statute that a 'dismissal' in the 'furtherance of justice' be accompanied by a specification of reasons, acts as a restraint on the exercise of that discretion and contemplates that the exercise of such discretion be reviewable by a higher court. (*People* v. *Ritchie* (1971) 17 Cal.App.3d 1098 [95 Cal.Rptr. 462]; *People* v. *Beasley* (1970) 5 Cal.App.3d 617 [85 Cal.Rptr. 501].)

"Any dismissal purporting to be in the 'furtherance of justice' must necessarily be based on a consideration, not only of defendant's interest, but of the interest of society in seeing that its laws are effectively implemented. (See *People* v. *Orin* (1975) 13 Cal.3d 937, 944-947 [120 Cal.Rptr. 65, 533 P.2d 193].)

"We are acutely aware of the difficulty of the task of trial judges in imposing severe punishment on individuals who stand before them and that as human beings, judges may from time to time feel some sympathy for a defendant who is a recipient of that punishment. Undoubtedly, it is these factors which prompt the making of remarks such as one made by the trial judge here and which are so often seized upon by defendants in making the argument which defendant makes here.

"In any event, the unwillingness of a trial judge to face that difficult task or the sympathy which the trial judge might feel for a particular defendant cannot, however, constitute a basis for a complete or partial dismissal 'in furtherance of justice' under Penal Code section 1385. (See *People* v. *McAlonan* (1972) 22 Cal.App.3d 982, 986-987 [99 Cal.Rptr. 733]; *People* v. *Superior Court (Long)* (1976) 56 Cal.App.3d 374, 379 [126 Cal.Rptr. 465].)"

■■■ In view of the evidence in this case and the finding of the jury no purpose would be served by a remand for a ruling on the motion to strike the special circumstance. (See also *People* v. *Moore* (1984) 162 Cal.App.3d 709, 717-718 [208 Cal.Rptr. 771].)

F. *The Claimed Systematic Exclusion of Fair and Impartial Jurors From the Defendant's Jury*

■■■ Finally, the defendant argues that he was denied a fair trial because the jury that tried him was "unconstitutionally prone to convict and unre-

presentative." He bases this claim of prejudice upon the "systematic removal" from the jury of all panel members who stated that they would never consider imposing the death penalty in any case, even though they indicated they could fairly and impartially try the question of guilt or innocence. In making this argument, the defendant ignores existing California authority to the contrary, and relies instead upon a recent federal court decision from the Eighth Circuit (*Grigsby* v. *Mabry* (8th Cir. 1985) 758 F.2d 226) which, based upon the information which that court had before it, concluded that "death qualified juries" are more likely to convict, more predisposed to favor the prosecution, and less representative than ordinary juries that try noncapital cases. In *Grigsby,* the court concluded that this violated a capital defendant's Sixth and Fourteenth Amendment rights to an impartial jury.

However, this view has been expressly rejected in California, mostly recently in *People* v. *Fields* (1983) 35 Cal.3d 329, 349 [197 Cal.Rptr. 803, 673 P.2d 680].[57] *Fields* held that persons not willing to vote for the death penalty are *not* a cognizable group, the exclusion of which would violate some constitutional interest of a capital defendant. We are bound by that decision here.

## DISPOSITION

The judgment of conviction, including the sentence of life imprisonment without the possibility of parole, is affirmed.

Lillie, P. J., concurred.

**JOHNSON, J.,** Concurring and Dissenting.—With but one exception I concur in my colleagues' excellent treatment of a series of difficult legal issues arising out of the trial of Harry Sassounian. However, this single exception would require reversal of the special circumstance finding. Thus I must respectfully dissent from the part of the majority opinion dealing with the issue of jury misconduct and from its affirmance of that portion of the judgment determining appellant was guilty of the special circumstance of murder motivated by the victim's national origin. I would affirm the conviction but reverse and remand for a new trial of the special circumstance finding.

The People concede jury misconduct occurred when certain inadmissible and unadmitted evidence seeped into the jury room. They contend, however, this misconduct did *not* prejudice the deliberations or impeach the verdict.

---

[57]Moreover, the *Grigsby* decision is itself no longer valid authority. On May 5, 1986, subsequent to oral argument in this case, the United States Supreme Court reversed *Grigsby,* sub nom., *Lockhart* v. *McCree* (1986) 476 U.S. — [90 L.Ed.2d 137, 106 S.Ct. 1758].

I disagree for two independent and sufficient reasons. First the evidence the majority employs to rebut the presumption of prejudice is inadmissible. Second, assuming its admissibility this evidence is insufficient to overcome the presumption.

## I. THE CONFLICTING FACTS SURROUNDING THE ERRONEOUSLY RECEIVED EVIDENCE

The majority already has described the general tenor of the jury misconduct in this case. At the risk of being somewhat repetitious I shall attempt to reconstruct what happened in more detail as best can be done from the court's voir dire of the jurors after the allegation of misconduct.

As will be recalled, virtually the only evidence the People actually succeeded in introducing which bore directly on the special circumstance issue was the jailhouse informant who said the defendant claimed he had shot the victim because he was Turkish. However, late in the trial the prosecutor attempted to bolster her case by offering the testimony of a reporter from United Press International (UPI). According to the offer of proof, this witness would have testified he received a telephone call within minutes of the shooting of the Turkish consul. The call purported to come from the Justice Commandos for the Armenian Genocide and took credit for the assassination.

Before the UPI reporter could testify about this conversation, the defense attorney objected. A lengthy bench conference ensued over the admissibility of this evidence. Fully 10 pages of transcript are required to report the offer of proof, the arguments of counsel and the judge's questions and comments. Ultimately, the court ruled the call was inadmissible on grounds of relevancy and hearsay since the voice on the phone and the organization he purported to represent had not been linked to the defendant in any way.

Evidently one or more jurors—presumably those seated closest to the bench—overheard some of the colloquy about this item of evidence. In particular, one or more apparently overheard the description of the telephone conversation itself and the prosecutor's argument for why it was relevant to appellant's guilt of the special circumstance.[1] Indeed Ms. Kennelly, one of

[1]Juror Kennelly's recollection of this item of unadmitted evidence is strikingly similar to language the prosecutor used in seeking to justify why it should be admitted. The prosecutor argued: "Mr. Busch testified that one of the reasons for the killing was to gain publicity for revenge for what the Turks did in 1915, this is exactly carrying out that part of the publicity by making a phone call and by claiming credit." She reiterated the call was for purposes of publicity several times during her argument. Juror Kennelly, in turn, testified: "I remember it being said in the courtroom, that there had been—been a call for publicity. I don't know who they phoned . . . . But it was something to do with publicity."

the jurors who evidently overheard the offer of proof about the telephone call, remembered it as evidence *admitted* at the trial.[2]

Later on, during deliberations, several jurors were trying to convince a recalcitrant member, Ms. Rankins, to vote appellant guilty of the special circumstance. One of them told her about the telephone call and argued this was the reason for the murder.[3] Two other jurors remembered a juror mentioning the telephone call during deliberations. The jury foreman testified "we said we couldn't *talk* about that because it wasn't brought up in court." (Italics added.) Neither Ms. Kennelly nor Ms. Rankins testified to recalling any admonition to disregard the telephone call in reaching their *personal* verdicts on the special circumstance issue. Indeed Ms. Rankins specifically denied anyone said that they shouldn't *talk* about this call when

---

[2]Ms. Kennelly testified as follows:

"THE COURT: . . . (D)o you think anybody discussed anything that either, as to the verdict of guilty or either one of the special circumstances, that did not come out in evidence?

"Ms. KENNELLY: No.

". . . . . . . . . . . . . . . . . . .

"THE COURT: Okay. Now what about any discussion of a phone call that may have been made at or about the time of the incident, the shooting? Was there ever anybody discussing anything about a phone call having been made at or about that time?

"Ms. KENNELLY: I remember that in the evidence. That was said.

"THE COURT: What was said?

"Ms. KENNELLY: That there was a phone call. That is all I remember when we were sitting in there, in the jury box.

"THE COURT: The phone call to whom?

"Ms. KENNELLY: Let me think. There was a phone call. I remember it being said in the courtroom, that there had been—been a call for publicity.

"I don't know who they phoned. I don't remember that. I don't recall that. But it was something to do with publicity.

"THE COURT: You mean before we started the trial there was something said about a phone call?

"Ms. KENNELLY: No. During the trial I remember something about a phone call.

". . . . . . . . . . . . . . . . . . .

"Ms. RUBIN (The prosecutor): This phone call that you remember hearing during the course of the trial, was that at a point in time when evidence was being taken, or was that at a point in time that we were questioning jurors before we selected you all as jurors, if you remember?

"Ms. KENNELLY: I don't believe it would be a question to us before. Just seems like I heard it in the courtroom, but I can't remember.

"Seems like some witness, maybe. I don't really recall exactly. I just know I heard it in the courtroom."

[3]Ms. Rankins testified as follows about this exchange:

"Ms. RANKINS: We was talking in deliberation about . . . the . . . special circumstance concerning nationality.

"And it stated in the instructions . . . that if there was no other reason that you can say why the defendant did kill the Turkish Consul because of his nationality, that you should go for the most reasonable reason, I believe it said, something similar to that.

". . . . . . . . . . . . . . . . . . .

"Well, one of the jurors mentioned that there was a phone call made to the Turkish Consulate concerning a threatening call and said why would there be other reasons, assuming the call."

it was mentioned during deliberations and Ms. Kennelly recalled it as *evidence* admitted at the trial, not something they were warned had not been admitted.

At the time she heard about the telephone call, Ms. Rankins was holding out for acquittal on the special circumstance allegation. Shortly after hearing of this additional evidence, she voted for conviction on the special circumstance. A few days later, Ms. Rankins had second thoughts, asked to change her vote and revealed she had been told about the telephone call.

II. The Standard for Evaluating Whether Jury Misconduct Prejudiced a Defendant

These are the admissible facts. As the majority opinion emphasizes, Evidence Code section 1150 bars us from considering certain other facts. Most significantly, we must ignore Ms. Rankins' testimony she voted to convict on the special circumstance only because she heard the inadmissible evidence about the telephone call. I do not argue the rule is otherwise. But this necessarily does lend an Alice in Wonderland quality to our discussion of whether appellant was actually prejudiced by the admitted jury misconduct in this case. The most direct evidence of prejudice—the juror's own recollection of how the introduction of this inadmissible evidence impacted on her personal decisionmaking—cannot even be considered by this court.[4] So we are left to speculations about hypothetical jurors, probabilities, and presumptions.

The basic test has been stated and restated by the Supreme Court: "It is well settled that a presumption of prejudice arises from any juror misconduct.

---

[4]Justice Lucas has expressed the view this type of evidence should be and indeed *is* admissible. In his dissent in *In re Stankewitz* (1985) 40 Cal.3d 391, 404-405 [220 Cal.Rptr. 382, 708 P.2d 1260] he disagreed with the majority's refusal to admit jurors' statements to the effect they had not been misled by a fellow juror's misstatement of the law. "(T)he majority holds that the presumption cannot be rebutted by declarations from jurors . . . attesting that the supposed misconduct did not influence their verdict. The majority finds such declarations 'plainly inadmissible' under section 1150. . . . Yet, how do we reconcile that holding with the plain language of article VI, section 13 of the state Constitution, which forbids the reversal of any judgment for *any* error of procedure unless the error has resulted in a 'miscarriage of justice'?

"In my view, if the jurors agree that supposed juror misconduct played no role in their decision, that fact should be admissible and the judgment affirmed despite the error. Indeed, how else are the People to rebut the presumption of prejudice? To the extent that section 1150 would require a different result, we should hold the section invalid." (Italics added.)

The instant case, of course, locks the evidentiary manacle on the other foot. In *Stankewitz* Justice Lucas complains the majority illegally and perhaps unconstitutionally excluded juror testimony to the effect misconduct played no role in reaching their verdict. Here we exclude the testimony of a juror who says the jury misconduct *did* play a definite role in her decision to vote for appellant's guilt. If Justice Lucas's view ever prevails on the admissibility of juror testimony about their mental processes and how the misconduct in no way influenced their decisions it will be difficult to deny the admissibility of like testimony which tends to show a juror was swayed by the misconduct.

. . ." (*People* v. *Honeycutt* (1977) 20 Cal.3d 150, 156 [141 Cal.Rptr. 698, 570 P.2d 1050].) "However, the presumption is not conclusive; it may be rebutted by an *affirmative* evidentiary showing that prejudice does *not* exist *or* by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct." (Citations omitted.) (*Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 417 [185 Cal.Rptr. 654, 650 P.2d 1171], italics added.)

An examination of the Supreme Court's formulation makes it apparent we are asked to conduct two inquiries in this case. If the People prevail on either the judgment is to be affirmed. First, the courts look for *affirmative* (and admissible) evidence demonstrating the jury misconduct did not prejudice the defendant. Perhaps the clearest example of nonprejudicial jury misconduct would be something which actually favored the defendant's side of the case or was completely neutral or irrelevant to his guilt.[5] Secondly, assuming the jury misconduct prejudiced the defendant to some degree, we are to review the entire record to determine whether there is a reasonable probability the misconduct affected the verdict. Thus, if the evidence of guilt is overwhelming and the prejudicial effect of the misconduct only slight it may be apparent the misconduct played no significant part in the jury's finding of guilt and the conviction can be affirmed.[6]

Fortunately, prior opinions supply further guidance in conducting these inquiries. "Some of the factors to be considered when determining whether the presumption is rebutted are the strength of the evidence that misconduct occurred, the nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued." (*Hasson* v. *Ford Motor Co.*, *supra*, 32 Cal.3d 388, 417.) The misconduct in this case was of a specific, though common variety—one or more jurors heard unadmitted (and inadmissible) evidence. "[W]hether a defendant has been injured by jury misconduct *in receiving evidence* outside of court necessarily depends upon whether the jury's impartiality has been adversely affected, whether the prosecution's burden of proof has been lightened and whether any asserted defense has been contradicted. If the answer to any of these questions is in the affirmative,

---

[5]See, e.g., *People* v. *Sutter* (1982) 134 Cal.App.3d 806, 821 [184 Cal.Rptr. 829] where a juror's unauthorized view of the scene was not prejudicial, because "the scene of the crime was not at issue and there were no conflicts in the evidence . . . ."

[6]The Supreme Court has made it clear, however, this is not merely the *Watson* standard of harmless error. "Unless the presumption of prejudice is rebutted, the accused is entitled to a new trial *regardless of the probability that a more favorable verdict would have resulted* absent the error." (*People* v. *Hogan* (1982) 31 Cal.3d 815, 846 [183 Cal.Rptr. 817, 647 P.2d 93], citing *People* v. *Pierce* (1979) 24 Cal.3d 199, 206-207 [155 Cal.Rptr. 657, 595 P. 91], italics added.)

the defendant has been prejudiced . . . ." (*People* v. *Martinez* (1978) 82 Cal.App.3d 1, 22 [147 Cal.Rptr. 208], italics added.)

Thus, what a reviewing court is attempting to do is assess whether it is reasonably probable one or more of these jurors was influenced in the direction of appellant's guilt of the special circumstance by the inadmissible evidence which came to their attention. Ignoring the most direct proof at least one juror indeed found appellant guilty only because of that inadmissible evidence, we are asked to examine the rest of the record to see whether it is "reasonably probable" a juror may have been somewhat more inclined to do so because of the telephone call.

In this context it is important to identify who bears the "risk of nonpersuasion." If the admissible evidence in this hypothetical inquiry is slight, or weak, or inconclusive, who prevails? The presumption of prejudice, of course, answers this question. It implements "some public policy other than to facilitate the determination of the particular action"—in this case, the public policy that in both appearance and reality jury decisionmaking be sound and free from improper influences. Indeed this is a public policy embedded in the California Constitution: "Trial by jury is an inviolate right . . . ." (Cal. Const., art. I, § 16.) And it is a public policy implemented through legislative guarantees that jurors render a true verdict according to the evidence they hear at trial. (Code Civ. Proc., § 604; Pen. Code, § 1046.) Accordingly, in my view this presumption is one which allocates the burden of proof not merely the burden of producing evidence. (Evid. Code, § 605.)[7] "The effect of a presumption affecting the burden of proof is to impose upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact." (Evid. Code, § 606.)

---

[7] I have not found authority expressly classifying this presumption of prejudice as one which shifts the burden of proof. Indeed the dissent in *People* v. *Martinez, supra,* 82 Cal.App.3d 1, 29, makes a point of avoiding the issue by saying whichever variety of presumption it may be the prosecution failed to meet its responsibility in that case since it offered *no* evidence at the hearing on jury misconduct. Nevertheless, the language the Supreme Court has used in describing the burden the prosecution carries in countering the presumption resonates with the sounds of a burden of proof not merely a burden of producing evidence. As long ago as 1863 the California Supreme Court held "the burden of proof lay upon the Government to show that the prisoner had not suffered any injury by reason of (misconduct which affected the jury)." (*People* v. *Brannigan* (1863) 21 Cal. 337, 341.) In 1894, the court ruled where juror misconduct is established the prosecution has the burden "'to show that *as a matter of fact*'" that the misconduct did not affect the verdict. (*People* v. *Stokes* (1894) 103 Cal. 193, 198 [37 P. 207], italics added.) This same theme follows through the years to the court's recent pronouncement in *In re Stankewitz* (1985) 40 Cal.3d 391, 402 [220 Cal.Rptr. 382, 708 P.2d 1260]: "It is settled that 'unless the prosecution *rebuts* that presumption by *proof* that no prejudice actually resulted, the defendant is entitled to a new trial.' (Citation omitted.) The People's only attempt to *carry that heavy burden* in this case is (declarations of two jurors which the Court found insufficient)." (Italics added.)

The "presumed fact" in this case is that the defendant was prejudiced by the jury misconduct. However, I have been unable to locate California authority on the *degree* of the People's burden. Does the prosecution only have to prove the nonexistence of prejudice by a preponderance of the evidence? Official commentary to the Evidence Code instructs us: "Certain presumptions affecting the burden of proof may be overcome only by clear and convincing proof. . . . [A] party against whom the presumption operates will . . . be required to persuade the trier of fact of the nonexistence of the presumed fact by proof '"sufficiently strong to command the unhesitating assent of every reasonable mind."'" (Comment, Assembly Committee on Judiciary, Cal. Evid. Code, following § 606, 29B West's Ann. Evid. Code (1973 ed.) pp. 569-570, Deering's Ann. Evid. Code (1966 ed.) p. 185.) Is the presumption of prejudice from jury misconduct one of these select presumptions? Given the critical role we assign to juries and the painstaking steps we take to shield them from misleading evidence and improper influences it would seem logical to require "clear and convincing proof" the jurors were not infected when, despite our best efforts, the germ in fact penetrates the jury room. However, I do not rely on this higher standard in this dissent. Instead I assume *arguendo* the prosecution only bears the lower burden of *proving* the nonexistence of prejudice by a preponderance of the evidence.

At a minimum, a presumption allocating the burden of proof places the "risk of nonpersuasion" on the party against whom the presumption runs. That is, it tells us which side must lose if the evidence is nonexistent or weak or equally balanced. When it comes to jury misconduct the People bear the "risk of nonpersuasion." So unless the available, admissible evidence on this question is strong enough to persuade a court *no* juror *could* have been influenced by this item of inadmissible evidence to vote guilty of the special circumstance where he or she would otherwise have voted not guilty, it is my position we should reverse the special circumstance finding.

III. Assessing the Evidence of "Nonprejudice"

And what is the relevant, available, admissible evidence about the effect of this telephone call on juror decisionmaking?

(1) The telephone call to the UPI reporter was an important though inadmissible item of proof on the central issue of whether appellant was motivated to murder the victim because of the latter's national origin. True, in a technical logical sense it might be said to be irrelevant and thus something a "reasonable juror" would ignore in reaching a verdict on this issue. Still it has apparent relevance, the kind of apparent relevance which led the prosecutor to urge its admissibility in vehement terms. Certainly, if it had

enough apparent relevance for an experienced prosecutor to make this argument, it could mislead a juror untutored in formal logic or legal reasoning to regard it as strong evidence appellant killed because of the victim's nationality.

(2) The other evidence on this central issue of appellant's motivation was far from overwhelming. I agree with the majority it was sufficient to support a jury verdict appellant was guilty of the special circumstance. But to my mind this is a close question. In terms of *admissible* evidence, the verdict hangs almost entirely from the tattered testimonial thread of a jailhouse informant. Only by resolving the conflicting evidence on this witness's credibility entirely in favor of the prosecution am I able to find the evidence of guilt even barely sufficient to support the special circumstance finding. Since the admissible evidence of guilt was barely enough to convict, it is more likely the inadmissible evidence which came to the jury's attention affected the decision of one or more jurors than if this other evidence were so overwhelming it would have compelled any reasonable juror to find him guilty of the special circumstance.

(3) One juror, Ms. Rankins, asked to change her verdict to not guilty on the special circumstance allegation while the jury was still deliberating about the penalty. This is *objective* evidence[8] that at least one juror found this an extremely close case on this issue *for some reason.* Moreover, it is significant this is one of the four jurors who recalled being told about the telephone call. Only if there is admissible, persuasive evidence *excluding* the possibility this juror was pushed over the line to vote guilty by this inadmissible evidence can it be said the presumption of prejudice is overcome.

(4) This brings us to the primary piece of evidence suggesting the erroneously received evidence *might* not have affected the verdict. The jury foreman testified "they" said they could not "talk" about the telephone call because it had not been admitted into evidence. Eight other jurors did not recall any mention of the call or whether they could talk about it or consider it. Two of the remaining three recall the evidence but no mention they could not "talk" about it. The third only testifies they were "pretty thoughtful to stop it . . . if there was *anything* that we couldn't *talk* about." (Italics added.) Moreover, even the foreman does not claim anyone specif-

---

[8]Although Juror Rankins' behavior is "objective" evidence in a sense, it still may be inadmissible "to show the *effect* of (the improper statement about the telephone call) in influencing (Juror Rankins) *to assent to* . . . the verdict . . . ." (Evid. Code, § 1150, subd. (a).) (See pp. 424-426, *post.*) However, if this evidence is inadmissible for this purpose so is the evidence relied upon by the majority—the jury foreman's statement "they" said they must not "talk" about the telephone call.

ically admonished the jurors they could not *consider* this call in reaching their personal decisions about guilt. Nor is there testimony Juror Rankins expressly agreed she would disregard the telephone call in reaching her personal decision.

I have included this testimony about statements jurors recall making or hearing others make on the list of available, admissible evidence. I did so, however, only because the majority relies so heavily on these statements in concluding the jury misconduct was nonprejudicial. Shortly I will argue why this evidence even if admissible on the issue is insufficient to overcome the presumption of prejudice. But first as an independent and sufficient grounds for this dissent I find these statements inadmissible. Without them, there is no evidence available to even begin proving the jury misconduct was nonprejudicial in this case.

A. *Juror Testimony About Statements Made in the Jury Room Cannot Be Admitted to Prove the Jurors Disregarded the Erroneously Received Evidence About the Telephone Call*

The Supreme Court's recent decision *In re Stankewitz, supra,* 40 Cal.3d 391, points out this sort of testimony is not admissible at least to prove what the majority argues it does—the jurors' collective rejection of inadmissible evidence in reaching their individual decisions about guilt. In *Stankewitz,* the court takes pains to distinguish between two kinds of *facts.* Certain types of evidence are admissible to prove one of these categories of fact—things which impeach the verdict. But there is no type of evidence which is admissible to prove the other kind of fact—the effect of these improprieties on the jurors' decisionmaking.

As Justice Mosk says in his majority opinion on behalf of six members of the court: "The Legislature has declared that evidence of certain facts is admissible to impeach a verdict: 'Upon an inquiry as to the validity of a verdict, *any otherwise admissible evidence may be received as to statements made,* or conduct, conditions or events occurring, either within or without the jury room, *of such a character as is likely to have influenced the verdict improperly.'* (Statutory citations omitted.) . . . . By contrast, the Legislature has declared evidence of certain other facts to be *inadmissible* for this purpose: 'No evidence is admissible to show the *effect* of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined.'" (Statutory citation omitted.) (40 Cal.3d at p. 397, italics added by Supreme Court.)

Justice Mosk pursued this distinction a step further. "*Statements* have a greater tendency than nonverbal acts to implicate the reasoning processes

of jurors—e.g., *what the juror making the statement meant and what the juror hearing it understood*. They are therefore more apt to be misused by counsel in an effort to improperly open such processes to scrutiny. But no such misuse is threatened when, as here, the *very making of the statement* sought to be admitted *would itself constitute misconduct*.'' (40 Cal.3d at p. 398, italics added.)

Thus the *Stankewitz* court has held the language of Evidence Code, section 1150, subdivision (a) means what it says. Overt acts such as what the jury actually said in the jury room are admissible to show something improper happened which is likely to have influenced the verdict. However, *no* evidence, including what the jury said in the jury room, is admissible to prove the *effect* this improper conduct had on an individual juror or jurors. Not only are individual jurors barred ·from testifying about their subjective thought processes in dealing with the improper influences but statements they or others made and other circumstantial evidence of those thought processes likewise are inadmissible.

In her concurring and dissenting opinion in a still more recent case, *Ballard* v. *Uribe* (1986) 41 Cal.3d 564, 596 [224 Cal.Rptr. 664, 715 P.2d 624], Chief Justice Bird underscores this same point. ''A distinction must be drawn between two questions: (1) whether a statement is admissible to show the effect on the jurors' mental processes of *other,* improper statements; and (2) whether evidence of a statement may be admitted to show that the statement itself was improper, after which a court may determine the likelihood that the statement influenced the verdict. Under Evidence Code section 1150, the answer to the first question is clearly 'no.' It is equally clear that the answer to the second question is 'yes.''' (Italics in original.)

Thus, under section 1150 Juror Rankins' testimony someone made a statement to her about a telephone call is admissible ''to show the statement itself was improper.'' But the jury foreman's testimony he or others made *statements* they should not talk about the telephone call is *in*admissible to show Juror Rankins or any other juror disregarded the improperly received evidence in deciding to ''assent to . . . the verdict.'' The same is true, of course, about testimony from other jurors about what was said or not said on the question of how they should treat the telephone call. So presumably is Juror Rankins' ''conduct'' in asking to recall her vote on the special circumstance finding. That is, the fact she made this request cannot be used to infer the erroneously received telephone call influenced her ''to assent to . . . the verdict'' any more than the jury foreman's admonition against the telephone call can be used to infer the call did *not* influence her personal assent to the verdict.

We must strike items (3) and (4) from our list of available evidence on the jury prejudice issue—Juror Rankins' request to recall her vote and the jurors' statements one of their number cautioned against the telephone call. Disregarding these items only (1) and (2) remain—the critical importance of the erroneously received evidence about the telephone call and the bare sufficiency of the other evidence on appellant's motivation. Both of these support rather than rebut the presumption of prejudice. Accordingly, I feel compelled to conclude the prosecution utterly failed to overcome the presumption and must dissent from my colleague's affirmance of the special circumstance finding.

B. *Assuming the Jurors' Statements About an Admonition Against the Erroneously Received Evidence Were Admissible These Statements Still Are Insufficient to Overcome the Presumption of Prejudice*

Assuming arguendo the admissibility of all four items of evidence outlined earlier I conclude the presumption of prejudice still is not overcome. Here the erroneously considered evidence clearly "lightened" the prosecution's burden of proof on the special circumstance allegation by supplying highly prejudicial evidence against appellant on that issue. If erroneously considered evidence does lighten the prosecution's burden "the defendant has been prejudiced and the conviction must be reversed (unless) a review of the entire record demonstrates that the appellant has suffered no prejudice from the misconduct, . . ." (*People* v. *Martinez, supra,* 82 Cal.App.3d 1, 22.)

As to this second inquiry, I first note this was a close case, not one where the inadmissible evidence was dwarfed by a mountain of other proof of guilt. This factor has been considered important on the issue of prejudice in many prior cases, e.g., *People* v. *Allen* (1978) 77 Cal.App.3d 924 [144 Cal.Rptr. 6] (mention defendant was on parole prejudicial in "an extremely close case") contrasted with *People* v. *Hill* (1980) 110 Cal.App.3d 937 [168 Cal.Rptr. 272] (receipt of picture noting defendant had rape/parole violation "was not prejudicial in view of the record which pointed convincingly to guilt"). In the instant case, the erroneously received evidence was much more critical to the core issue than the mere mention defendant was on parole in *Allen* and the case was not only "extremely close" but the other evidence of guilt was barely sufficient to support conviction on the special circumstance allegation.

To overcome this powerful evidence supporting a conclusion of prejudice, the majority opinion relies primarily on the jury foreman's testimony "they" said they could not "talk" about this erroneously received evidence. The majority considers this statement to be sufficient evidence to *prove* all the jurors completely disregarded the telephone call in making their personal

decisions about appellant's guilt of the special circumstance allegation. Of necessity, the majority further finds this statement supplies sufficient proof of this conclusion to overcome the presumption of prejudice.

To understand my reservations, focus on the juror who found this such a close case she actually asked to change her vote to not guilty on the special circumstance issue shortly after the verdict was returned. "Because a defendant charged with crime has a right to the unanimous verdict of 12 impartial jurors (citation omitted), it is settled that a conviction cannot stand *if even a single juror* has been improperly influenced." (Citation omitted.) (*People* v. *Pierce, supra,* 24 Cal.3d 199, 208, italics added.) In order to be persuaded this juror was not influenced in any way to vote guilty one has to believe the jury foreman or one of the other jurors indeed said they could not talk about the telephone call. One also would have to believe this particular juror heard that statement. One would have to believe this particular juror understood the statement about not "talking" about this evidence to mean she could not *consider* it in reaching her *personal* decision on the question of guilt. And one would have to believe she followed this admonition conscientiously and did not allow this item of erroneously received evidence to influence her decision.

It is a giant leap from a factual finding one juror said we cannot talk about this erroneously received evidence to the conclusion the erroneously received evidence in no way affected the personal decision of a juror who was so unsure the evidence established guilt she asked to withdraw her vote a short time later. This same juror denied even hearing anyone say they could not talk about the erroneously received evidence. Assuming she did hear that statement it is mere speculation she interpreted it to mean she could not factor it into her own decisionmaking and, furthermore, that she abided by the admonition. One could with equal ease speculate a juror in this sort of agonized indecision would grasp at anything and everything she heard to help her reach a personal verdict.

It probably is for reasons akin to these the Legislature has barred courts from even considering jurors' admonitions and their other statements on the issue of whether jury members were improperly influenced to assent to a guilty verdict. (See pp. 424-426 *ante.*) It also may account for the reluctance of appellate courts to find admonitions coming from the trial court itself are enough to cure serious jury misconduct.

In *People* v. *Hogan, supra,* 31 Cal.3d 815, an entire audiotape of a conversation between defendant and his wife was sent to the jury room. Included was a portion the trial court had struck because it suggested defendant was unwilling to take a lie detector test. When this was brought

to the court's attention, the judge recalled the jurors and admonished them at length against considering this as evidence against the defendant. The Supreme Court reversed despite the court's admonition. "For several reasons, the admonition given in this case does not by itself rebut the presumption of prejudice. First, the nature of the improperly considered evidence is so prejudicial that many courts have held it incurable by admonition alone. (*Bowen* v. *Eyman* (D.Ariz. 1970) 324 F.Supp. 339, 342; *State* v. *Green* (1963) 254 Iowa 1379 . . . .; *State* v. *Britt* (1959) 235 S.C. 395 . . . .) Second, the admonition here cannot be deemed a prompt one for it followed by some 16 hours both the jury's receipt of the evidence and the trial judge's discovery of the error. Third, the admonition was somewhat one-sided. The admonition to disregard singled out appellant's statement that he would take a lie detector test, while failing to state specifically the need to disregard the portion in which appellant expressed reluctance to take the test." (31 Cal.3d at pp. 847-848.)[9]

In the instant case, the "nature of the improperly received evidence" was so vital to a very close issue as to likewise be "so prejudicial" it might have been "incurable by (judicial) admonition alone." Here, moreover, there was no question of the timeliness or completeness of a judicial admonition because there was none. Thus, the present case contrasts with *People* v. *Knights* (1985) 166 Cal.App.3d 46 [212 Cal.Rptr. 307], where the jury foreman immediately advised the court when one of the jurors spoke about inadmissible evidence. This gave the court the opportunity to replace the offending juror, to individually question the others about their ability to disregard the erroneously received item, and to instruct them to begin the deliberations anew.

In a recent Court of Appeal case, *People* v. *Andrews* (1983) 149 Cal.App.3d 358 [196 Cal.Rptr. 796, 46 A.L.R.4th 1], not only had the judge admonished the jury but there were jury affidavits the jurors had abided by the admonition and disregarded the improperly received material. During trial it came to the attention of the court that some jurors might have read a newspaper article reporting the defendant's wife had pled guilty to one of the counts. The judge admonished the jury to disregard and not read any news releases about the trial. Inadvertently the newspaper articles

---

[9]As a fourth reason for finding the court's admonition insufficient to dispel the presumption of prejudice the Supreme Court pointed to a factor relevant in the instant case as well. "(A)lthough the order for a new trial would be compelled in a noncapital case under the circumstances presented here, the *presumption of prejudice from jury contact with inadmissible evidence is even stronger in the context of a capital case.* 'It is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment. Nor can any ground of suspicion that the administration of justice has been interfered with be tolerated.' (*Mattox* v. *United States* (1892) 146 U.S. 140, 149 . . . .)" (31 Cal.3d at p. 848.)

were sent to the jury room. On appeal of the conviction, the court reversed on grounds of prejudicial jury misconduct. "Respondent asserts that as to the instant case, affidavits of the jurors that they acted in conformity with the court's admonition is [*sic*] sufficient to dispel the presumption of prejudice. We disagree." (*Id.*, at p. 365.) As in the instant case, the affidavits were in conflict about how the jury treated the erroneously admitted evidence. One juror reported it was agreed by all "'We discontinue any further talk regarding the article as well as disregard their contents . . . . [F]rom that point on, the subject of the newspaper articles was never brought up by anyone.'" However, another juror claimed "'We were all asking each other if we were supposed to have all these articles . . . to look at and we thought we were since they were there.'" (*Id.*, at p. 365, fn. 4.) The court concluded "the jury affidavits failed to rebut the presumption of prejudice and, because of the potentially injurious nature of the inadmissible evidence given to the jury, we cannot be assured that the prosecution's burden had not been lightened." (*Id.*, at p. 366.)

In the instant case, of course, the court did not admonish the jury to disregard this specific item of erroneously received evidence. We have one juror's testimony he or another juror admonished the rest they could not talk about the telephone call. We have another juror's testimony she heard no such admonishment and no one claims she expressly agreed to abide by the admonishment. If admonitions coming from a judge are not necessarily enough to find the jury has disregarded improperly received evidence, a fortiori, one must doubt the efficacy of a fellow juror's admonition that they should not talk about such evidence in guaranteeing none of the others actually considered it in reaching his or her own personal decision about guilt. Moreover, here, as in *Andrews,* there is the further problem the affidavits are in conflict as to what was said and what was heard about how to treat the erroneously received material. The indecisive juror says she was told about the erroneously considered evidence but was not told she couldn't talk about it or consider it. This sort of conflict contributed to the court's conclusion in *Andrews* that the "jury affidavits failed to rebut the presumption of prejudice."

In other respects the instant case is a more aggravated situation than either *Andrews* or *Hogan.* The erroneously received evidence was much more critical to the verdict in this case than the newspaper article in *Andrews* or the snip of audiotape in *Hogan.* It bore directly on the core issue. Moreover, the other evidence in this case was much less conclusive of guilt than the other evidence in either of these cases. Furthermore, in this case the erroneously received material was heard by a juror who was so uncertain of guilt she asked to recall her vote shortly after the verdict.

Given all these factors and remembering the risk of nonpersuasion falls upon the prosecution, I cannot in good conscience find the evidence *proves* there is no reasonable probability appellant was prejudiced by this jury misconduct. Accordingly, I would be compelled to reverse the special circumstance finding and remand for a new trial on this issue even were the juror's admonition properly in evidence.

I never differ with my colleagues lightly. Dissenting in this case, in particular, is bothersome. I am well aware it is no easy task to prove the motivation for this specie of murder with admissible evidence.[10] It is not pleasing to conclude such a conviction has been tainted and thus must be overturned—even in part. Nonetheless, I am convinced this is such a case and have no choice but to dissent.

A petition for a rehearing was denied June 26, 1986. Johnson, J., was of the opinion that the petition should be granted. Appellant's petition for review by the Supreme Court was denied September 11, 1986. Bird, C. J., was of the opinion that the petition should be granted.

---

[10]Without testimony from the defendant or others who participated in the crime, this presents a proof problem somewhat akin to that posed by prosecutions of organized crime figures. In both situations the prosecution must show the person who committed the crime did so for a particular reason—in the case of organized crime because his gangland leader ordered it and in this case because of the victim's national origin. Knowing the criminal's background and relationships it is easy to assume why he committed the criminal act. But it is difficult to prove the purpose beyond a reasonable doubt. For discussion of these problems of proof see, e.g., Johnson, *Organized Crime: Challenge to the American Legal System*, 53 J. Crim. L. C. & P. S. 399, 416-418 (1962) and 54 J. Crim. L. C. & P. S. 1, 4-15 (1963).